**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellant,*

v.

AHMED RESSAM,
        *Defendant-Appellee.*

No. 09-30000

D.C. No.
2:99-cr-00666-
JCC-1

ORDERS
AMENDING
OPINION AND
DISSENT AND
AMENDED
OPINION AND
DISSENT

Appeal from the United States District Court
for the Western District of Washington
John C. Coughenour, District Judge, Presiding

Argued and Submitted
November 2, 2009—Seattle, Washington

Filed February 2, 2010
Amended December 10, 2010

Before: Arthur L. Alarcón, Ferdinand F. Fernandez and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Alarcón;
Dissent by Judge Fernandez

19763

## COUNSEL

Mark N. Bartlett, Helen J. Brunner (argued), Assistant United States Attorneys, Seattle, Washington, for the plaintiff-appellant.

Thomas W. Hillier, II (argued), Lissa W. Shook, Federal Public Defender, Seattle, Washington, for the defendant-appellee.

---

**ORDER**

This Court's opinion, filed February 2, 2010, is amended as follows:

1.　The three paragraphs on slip Opinion page 1882, line 20 to page 1883, line 13 that read:

> Both parties appealed to this Court. Ressam challenged his conviction while the Government challenged the reasonableness of the sentence. This Court vacated Ressam's conviction as to Count Nine, and remanded for resentencing without addressing the merits of the Government's arguments. *United States v. Ressam*, 474 F.3d 597 (9th Cir. 2007). The United States Supreme Court reversed this Court's decision and affirmed Ressam's conviction of Count Nine. *United States v. Ressam*, 128 S. Ct. 1858, 1862 (2008). Upon remand, this Court vacated the 22-year sentence, holding that the district court failed to determine the applicable Sentencing Guidelines range at the beginning of sentencing, as required by *United States v. Carty*, 520 F.3d 984 (9th Cir. 2008). *United States v. Ressam*, 538 F.3d 1166, 1167 (9th Cir. 2008).

> Upon remand, the district court again imposed a sentence of 22 years in prison, followed by five years of supervised release. The Government has appealed from this decision. It contends that when the relevant § 3553(a) factors are applied to the facts of this case, the sentence imposed is insufficient to accomplish the purposes of the statute, which directs

that "[t]he court shall impose a sentence *sufficient* but not greater than necessary" to accomplish the purposes of 18 U.S.C. § 3553(a)(2).

We vacate the sentence and remand for resentencing by a different district court judge because we conclude that the district court committed procedural error in failing to address specific, nonfrivolous arguments raised by the Government in imposing a sentence that is well below the advisory Sentencing Guidelines range.

are deleted and replaced by the following three paragraphs:

Both parties appealed to this Court. Ressam challenged his conviction while the Government challenged the reasonableness of the sentence. This Court vacated Ressam's conviction as to Count Nine, and remanded for resentencing without addressing the merits of the Government's arguments. *United States v. Ressam*, 474 F.3d 597, 604 (9th Cir. 2007). The United States Supreme Court reversed this Court's decision and affirmed Ressam's conviction as to Count Nine. *United States v. Ressam*, 553 U.S. 272, 277 (2008). Upon remand, this Court vacated the 22-year sentence, without addressing the Government's challenge to the reasonableness of Ressam's sentence, because the district court failed to determine the applicable Sentencing Guidelines range at the beginning of sentencing, as required by *United States v. Carty*, 520 F.3d 984, 991 (9th Cir.) (en banc), *cert. denied*, 553 U.S. 1061 (2008); *United States v. Ressam*, 538 F.3d 1166, 1167 (9th Cir. 2008).

At the resentencing hearing, the district court again imposed the same sentence. The Government has appealed from this decision. It contends that

when the relevant § 3553(a) factors are applied to the facts of this case, the sentence imposed is insufficient to accomplish the purposes of the statute, which directs that "[t]he court shall impose a sentence *sufficient* but not greater than necessary" to accomplish the purposes of 18 U.S.C. § 3553(a)(2). It complains in particular about the district court's failure to give appropriate consideration to Ressam's recantations and disavowal of his previous cooperation.

We vacate the sentence and remand for resentencing because we conclude that the sentencing process was seriously flawed, notably by the district court's failure to explain its reasons for rejecting the Government's argument that a longer sentence is needed to protect the public from future terrorist crimes by Ressam and imposing a sentence that is 43 years below the advisory Sentencing Guidelines. In addition, we conclude that the case should be assigned on remand to a different district judge because it appears that the original judge would have difficulties putting out of his mind previously expressed views as to an appropriate sentence.

2.   On slip Opinion page 1902, line 28-30, please replace:

In its argument, the prosecution reiterated the points raised in its November 28, 2008 sentencing memorandum wherein it recommended a sentence of 45 years in prison.[5]

with:

---

[5]At Ressam's December 3, 2008 resentencing hearing, the Government recommended that Ressam serve a term of life imprisonment, based upon his further recantation and attempts to distance himself from his earlier cooperation.

In its argument, the prosecution reiterated the points raised in its November 28, 2008 sentencing memorandum and recommended that Ressam serve a term of life imprisonment, based upon his further recantation and attempts to distance himself from his earlier cooperation.

3.  The five paragraphs on slip Opinion pages 1912-1916 that read:

The Government asserts "[t]he sole issue presented in this case is whether the sentence imposed on Ahmed Ressam is substantively unreasonable in light of the facts of this case and the factors set forth in 18 U.S.C. § 3553(a)."[7] Appellant's Opening Brief

---

[7]Title 18 U.S.C. § 3553(a) requires that a sentencing court consider the following factors:

(1)  the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)  the need for the sentence imposed—

(A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)  *to afford adequate deterrence to criminal conduct*;

(C)  *to protect the public from further crimes of the defendant*; and

(D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)  the kinds of sentences available;

(4)  the kinds of sentence and the sentencing range established for—

(A)  the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .

at 36. While recognizing that we "must first determine whether the district court committed significant procedural error," the Government maintains that procedural error is "a claim not raised in this appeal." *Id.* By our reading of the issue on appeal, however, the Government is also impliedly challenging the sentence as procedurally unsound because its arguments are grounded upon the district court's alleged failure adequately to consider and weigh each of the relevant § 3553(a) factors, including "to protect the public from further crimes of the defendant," and to explain its reasons for imposing a sentence 43 years below the low end of the Sentencing Guidelines range. *See Carty*, 520 F.3d at 993 (holding that "[i]t would be procedural error for a district court to fail to . . . consider the § 3553(a) factors . . . or to fail adequately to explain the sentence selected, including any deviation from the Guidelines range") (citing *Gall*, 128 S.Ct. at 596-97); *see also United States v. Paul*, 561 F.3d 970, 974 n.2 (9th Cir. 2009) ("It is the procedural provisions of 18 U.S.C.

---

   (5)   any pertinent policy statement . . .

   (6)   the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

   (7)   the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a) (emphasis added).

   Accordingly, in *Carty,* we instructed that "[t]he overarching statutory charge for a district court is to 'impose a sentence sufficient, but not greater than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." *Carty*, 520 F.3d at 991 (9th Cir. 2008) (citing 18 U.S.C. § 3553(a)(1)-(7); *United States v. Gall*, 552 U.S. 38, 50 n.6 (2007)) (emphasis added).

§ 3553(c) that require engagement with the [parties'] arguments, not the substantive provisions of 18 U.S.C. § 3553(a)"); *United States v. Overton*, 573 F.3d 679, 699 (9th Cir. 2009) (concluding that appellant "allude[d] to procedural error by accusing the district court of failing to address the § 3553(a) factors and adequately explain the sentence imposed").

We believe that the Government may have framed the issue on appeal as it did because more clarity is needed in defining what constitutes procedural error in imposing a sentence that is significantly below the Sentencing Guidelines range. Accordingly, before addressing the question whether the district court's decision in Ressam's case was procedurally erroneous or substantively unreasonable, we are persuaded that it is necessary to analyze each of these two concepts in some detail.

## A

In *Gall*, the Supreme Court instructed that

[r]egardless of whether the sentence imposed is inside or outside the Guidelines range, the appellate court must review the sentence under an abuse-of-discretion standard. *It must first* ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, *failing to consider the § 3553(a) factors*, *selecting a sentence based on clearly erroneous facts*, or *failing to adequately explain the chosen sentence* — including an explanation for any deviation from the Guidelines range. Assuming that the district court's sentencing decision is procedurally sound, the appellate court should then consider the

substantive reasonableness of the sentence imposed under an abuse-of-discretion standard."

*Gall*, 552 U.S. at 51 (emphasis added).

The Supreme Court's instruction implies that appellate courts have a *sua sponte* duty to undertake a review for procedural error even where, as here, no such error is expressly asserted by the Government in its appeal. As a preliminary matter, we now make explicit what was implicit in *Gall*. We hold that we must review sentencing decisions for procedural error, even where no claim of procedural error is raised. This holding is based upon our reading of the language in *Gall* instructing that an appellate court "must *first* ensure that the district court committed no significant procedural error," *id*. (emphasis added), our extensive review of the cases applying *Gall*, and our own holding in *Carty*. *See Carty*, 520 F.3d at 993 ("On appeal, we first consider whether the district court committed significant procedural error, then we consider the substantive reasonableness of the sentence.").

This requirement makes logical sense because "[i]n determining substantive reasonableness, we are to consider the totality of the circumstances, including the degree of variance for a sentence imposed outside the Guidelines range." *Id.* Thus, the substantive reasonableness analysis requires consideration of information necessarily gleaned from the review for procedural error, including the district court's calculation of the Sentencing Guidelines range and its consideration of the § 3553(a) factors. *Id*. Indeed, "substantive problems . . . [can be] a product of the District Court's procedurally flawed approach." *United States v. Goff*, 501 F.3d 250, 256 (3d Cir. 2007). "[I]f one cannot justify a result by the reasons

given, that result is, by definition, not a substantively reasonable conclusion to the logical steps provided." *United States v. Levinson*, 543 F.3d 190, 195 (3d Cir. 2008). Stated otherwise, it would be analytically problematic, if not impossible, to review a sentence for substantive reasonableness without having first reviewed the sentencing decision for procedural error. Accordingly, courts must review for procedural error even where the only claim raised on appeal is the substantive reasonableness of the sentence. *See, e.g., Overton*, 573 F.3d at 699 (reviewing for procedural error where appellant challenged his sentence as substantively unreasonable but "alluded to" procedural error); *United States v. Shaw*, 560 F.3d 1230, 1238 (11th Cir. 2009) (reviewing for procedural error even though the only contention on appeal was that the sentence was substantively unreasonable). Having concluded that we must first review a sentence for procedural error, we now address what that review entails.

are deleted and replaced by the following eight paragraphs:

The Government appeals the sentence imposed on Ressam by the district court. It argues that "[t]he sole issue presented in this case is whether the sentence imposed on Ahmed Ressam is substantively unreasonable in light of the facts of this case and the factors set forth in 18 U.S.C. § 3553(a)."[6] (Appellant's

---

[6]Title 18 U.S.C. § 3553(a) requires that a sentencing court consider the following factors:

   (1)   the nature and circumstances of the offense and the history and characteristics of the defendant;

   (2)   the need for the sentence imposed—

      (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

Opening Br. 36.) Specifically, the Government argues that the sentence is substantively unreasonable because the district court failed adequately to consider and weigh the relevant § 3553(a) factors, including "the need [for the sentence imposed] . . . to ensure the public is protected from future crimes by this defendant."[7] (*Id.* at 51.)

---

    (B)   *to afford adequate deterrence to criminal conduct*;

    (C)   *to protect the public from further crimes of the defendant*; and

    (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)   the kinds of sentences available;

(4)   the kinds of sentence and the sentencing range established for—

    (A)   the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .

(5)   any pertinent policy statement . . .

(6)   the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)   the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

Accordingly, in *Carty*, we instructed that "[t]he overarching statutory charge for a district court is to 'impose a sentence sufficient, but not greater than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." *Carty*, 520 F.3d at 991 (citing 18 U.S.C. § 3553(a)(1)-(2)); *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007)).

[7]Thus, "[t]here is a procedural as well as a substantive element to this argument." *United States v. Overton*, 573 F.3d 679, 699 (9th Cir. 2009)

The Government also argues that:

> the [district] court's stated reasons simply do not establish the reasonableness of a sentence two-thirds less than the low end of the advisory Guideline[s] range for a defendant who was convicted after trial of such extraordinary crimes, and then undermined the prosecution of two terrorists about whom he provided information by refusing to finish his agreed upon cooperation.

(*Id.* at 38.)

## A

Ordinarily, when a sentence is appealed, "[o]n appeal, we first consider whether the district court committed significant procedural error, then we consider the substantive reasonableness of the sentence." *Carty*, 520 F.3d at 993. In *Gall*, the Supreme Court instructed that:

> [r]egardless of whether the sentence imposed is inside or outside the Guidelines

---

(concluding that appellant "allude[d] to procedural error by accusing the district court of failing to address the § 3553(a) factors and adequately explain the sentence imposed"); *see also United States v. Paul*, 561 F.3d 970, 974 n.2 (9th Cir. 2009) ("It is the procedural provisions of 18 U.S.C. § 3553(c) that require engagement with the [parties'] arguments . . . not the substantive provisions of 18 U.S.C. § 3553(a)."). In its appeal, however, the Government has expressly waived any challenge to the procedural correctness of the sentence imposed by the district court. (Appellant's Opening Br. 36) ("The Court must first determine whether the district court committed significant procedural error, *a claim not raised in this appeal*. The Court must then consider whether the sentence is substantively unreasonable, the issue raised here.") (citations omitted) (emphasis added); (Appellant's Reply Br. 5) ("*A sentence is reviewed first for procedural error, although none is alleged here*.") (citation omitted) (emphasis added).

range, the appellate court must review the sentence under an abuse-of-discretion standard. It must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence — including an explanation for any deviation from the Guidelines range. Assuming that the district court's sentencing decision is procedurally sound, the appellate court should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard. When conducting this review, the court will, of course, take into account the totality of the circumstances, including the extent of any variance from the Guidelines range.

*Gall*, 552 U.S. at 51.

In this appeal the Government has elected not to argue that the district court committed significant procedural errors. Though the Government has identified many alleged missteps by the district court in the course of sentencing, its opening brief affirmatively states that procedural error is "a claim not raised on this appeal." *Id.*

Ressam contends that as a result we are precluded from considering procedural errors by the district court, citing the decision of the Supreme Court in *Greenlaw v. United States*, 554 U.S. 237, 128 S. Ct. 2559 (2008). In that case the Eighth Circuit sua

sponte ordered the imposition of a longer criminal sentence based on the failure of the district court to impose a mandatory minimum sentence, which the court of appeals identified as a plain error even though the Government had not appealed the sentence. The sentence was before the court of appeals because the defendant had challenged the sentence, contending that it was too long. The Supreme Court held that the court of appeals had erred by acting in the absence of a Government appeal or cross-appeal. *Greenlaw*, 128 S. Ct. at 2570. But that is not the situation here. The Government has appealed Ressam's sentence. That it has elected to focus on the substantive reasonableness of the sentence means that we are not required to review for procedural errors, but it does not mean that we are precluded from looking at the process that produced that sentence.

That is especially true here, where the Government's opening brief on appeal complains about a number of actions or failures by the district court that arguably constitute procedural errors. *See United States v. Overton*, 573 F.3d 679, 699 (9th Cir. 2009) (reviewing for procedural error where appellant challenged his sentence as substantively unreasonable but "allude[d] to procedural error by accusing the district court of failing to address the § 3553(a) factors and adequately explain the sentence imposed"); *United States v. Shaw*, 560 F.3d 1230, 1238 (11th Cir. 2009) (reviewing for procedural error even though the only contention on appeal was that the sentence was substantively unreasonable). Notably, the Government's arguments in this case are largely grounded upon the district court's alleged failure adequately to consider and weigh each of the relevant § 3553(a) factors, including "to protect the public from further crimes of the defendant," and to explain its reasons for

imposing a sentence 43 years below the low end of the Sentencing Guidelines range. *See Carty*, 520 F.3d at 993 (holding that "[i]t would be procedural error for a district court to fail to . . . consider the § 3553(a) factors . . . or to fail adequately to explain the sentence selected, including any deviation from the Guidelines range") (citing *Gall*, 128 S.Ct. at 596-97).

It should not be surprising that a challenge to the substantive reasonableness of a sentence will, in at least some cases, invite consideration of the process that produced the sentence. How a decision is arrived at can often shed light on the merit of the decision itself. Indeed, "substantive problems . . . [can be] a product of the District Court's procedurally flawed approach." *United States v. Goff*, 501 F.3d 250, 256 (3d Cir. 2007). In *Carty* we held that "[i]n determining substantive reasonableness, we are to consider the totality of the circumstances, including the degree of variance for a sentence imposed outside the Guidelines range." *Carty*, 520 F.3d at 993. The totality of circumstances to be considered in determining substantive reasonableness may surely include an examination of the sentencing process as a whole.

**B**

To better understand the relationship between alleged procedural errors and substantive unreasonableness, it would be useful to analyze each of the two concepts in some detail.

4.  On slip Opinion page 1929, line 15, please replace:

There are four procedural errors in the district court's analysis:

with:

> There are four procedural errors in the district court's analysis that are serious enough to cause us to lack confidence in the substantive reasonableness of the sentence that was imposed:

5. On slip Opinion page 1948, line 30, please replace:

> *Paul*, 561 F.3d at 975.

with:

> *Paul*, 561 F.3d at 975; *see also United States v. Vrdolyak*, 593 F.3d 676, 684 (7th Cir. 2010) (holding that "a judge's errors in calculating [a sentence] are indicative of an *idee fixe*" where the judge appears unwilling to waver in his conviction that a particular sentence is warranted).

6. On slip Opinion page 1949, beginning at line 5, please replace:

> For these reasons, we direct that the case be re-assigned to a different judge for resentencing.

### Conclusion

> Because the district court procedurally erred by failing to address specific arguments raised by the Government, or otherwise justify the extent of its departure from the advisory Guidelines, we must vacate the 22-year sentence imposed by the district court.

with:

> For these reasons, we direct that the case be re-assigned to a different judge for resentencing. We

intimate no view on what a proper sentence would be.

## Conclusion

We vacated the district court's original sentence of 22 years of imprisonment because it failed to permit this Court to conduct a meaningful review of the Government's challenge to the reasonableness of Ressam's sentence. *Ressam*, 538 F.3d at 1167. Prior to the sentencing hearing on July 27, 2005, Ressam argued that he had ceased cooperating with the Government because he was having trouble remembering details as the result of a combination of solitary confinement and repeated interrogation.

At the resentencing hearing, however, Ressam informed the district court that he "[retracted] almost all the statements he had made in the past" against two persons accused of terrorism in order to "cause their cases to be dismissed." Once again, the district court imposed the same 22-year sentence that this Court previously vacated because we could not decide whether it was reasonable based on the record of the original sentencing proceedings. In doing so, the district court failed to provide any reasons for rejecting the Government's arguments tethered to relevant § 3553(a) factors, including the value to be given to Ressam's early cooperation with the Government in view of his subsequent recantations and the need to protect the public from Ressam's potential to commit future terrorist crimes, as he will be only 53 years old upon his release. Without such explanations, we cannot conduct a meaningful review under the abuse of discretion standard to determine whether a sentence that is 43 years below the advisory Sentencing Guidelines is substantively reasonable, or whether a longer sentence is needed to

protect the public from future terrorist crimes by Ressam.

Because the trial judge's previously expressed views appear too entrenched to allow for the appearance of fairness on remand, we direct that the case be re-assigned to a different judge for resentencing.

---

## ORDER

My dissenting opinion, which commences at slip op. 1877, 1949 [593 F.3d 1095, 1134 (9th Cir. 2010)] is hereby amended as follows:

(1) Footnote 1 at slip op. 1949 [593 F.3d at 1134] is hereby revoked and the following is substituted in its place:

The government has expressly conceded that the sole issue on appeal is substantive reasonableness. That is all we should consider. In part II of the opinion, however, the majority, indicates that, despite the government's concession, it must and will take up procedural error, but shrouds that determination with a brume of words whereby it suggests that procedure must be melded into the substantive reasonableness determination. The result is a gallimaufry that, by mistake or design, will (as it does here) require courts to consider far more than substantive reasonableness, even when the parties raise only that. No doubt that hodgepodge has contributed to the majority's ultimate erroneous decision here. Unfortunately, it is also a disagreeable gift to the law, and it will keep on giving.

(2) Footnote reference 11 is added at the end of the penultimate paragraph on slip op. 1951 [593 F.3d at 1135].

(3) Footnote 11 is added at slip op. 1951 [593 F.3d at 1135] as follows:

> Even if I were to agree with the majority on the sentencing issue itself, I could not agree with its decision to remove Judge Coughenour because I do not see his approach to Ressam's sentencing as either indurate or inexplicable. I would not order transfer of this complex, long-standing (over ten years) case to a different district judge.

---

**OPINION**

ALARCÓN, Senior Circuit Judge:

Ahmed Ressam was convicted by a jury on nine counts of criminal activity in connection with his plot to carry out an attack against the United States by detonating explosives at the Los Angeles International Airport ("LAX") on the eve of the new Millennium, December 31, 1999. Ressam's crimes of conviction carry an advisory Sentencing Guidelines range of 65 years to life in prison, and a statutory maximum penalty of 130 years in prison.

In 2001, following his conviction, Ressam entered into a cooperation agreement with the Government. Under the terms of the agreement, the Government was to recommend a reduction in Ressam's sentence in exchange for his truthful and complete cooperation. Ressam provided information to law enforcement officials of the United States and of other countries concerning the organization, recruitment, and training activities of the worldwide terrorist network known as al-Qaeda. Ressam also testified against one of his co-conspirators, Mokhtar Haouari. After providing assistance to the Government for approximately two years, Ressam decided to cease cooperating and began recanting his prior testimony.

The district court sentenced Ressam to 22 years in prison to be followed by five years of supervised release.

Both parties appealed to this Court. Ressam challenged his conviction while the Government challenged the reasonableness of the sentence. This Court vacated Ressam's conviction as to Count Nine, and remanded for resentencing without addressing the merits of the Government's arguments. *United States v. Ressam*, 474 F.3d 597, 604 (9th Cir. 2007). The United States Supreme Court reversed this Court's decision and affirmed Ressam's conviction as to Count Nine. *United States v. Ressam*, 553 U.S. 272, 277 (2008). Upon remand, this Court vacated the 22-year sentence, without addressing the Government's challenge to the reasonableness of Ressam's sentence, because the district court failed to determine the applicable Sentencing Guidelines range at the beginning of sentencing, as required by *United States v. Carty*, 520 F.3d 984, 991 (9th Cir.) (en banc), *cert. denied*, 553 U.S. 1061 (2008); *United States v. Ressam*, 538 F.3d 1166, 1167 (9th Cir. 2008).

At the resentencing hearing, the district court again imposed the same sentence. The Government has appealed from this decision. It contends that when the relevant § 3553(a) factors are applied to the facts of this case, the sentence imposed is insufficient to accomplish the purposes of the statute, which directs that "[t]he court shall impose a sentence *sufficient* but not greater than necessary" to accomplish the purposes of 18 U.S.C. § 3553(a)(2). It complains in particular about the district court's failure to give appropriate consideration to Ressam's recantations and disavowal of his previous cooperation.

We vacate the sentence and remand for resentencing because we conclude that the sentencing process was seriously flawed, notably by the district court's failure to explain its reasons for rejecting the Government's argument that a longer sentence is needed to protect the public from future ter-

rorist crimes by Ressam and imposing a sentence that is 43 years below the advisory Sentencing Guidelines. In addition, we conclude that the case should be assigned on remand to a different district judge because it appears that the original judge would have difficulties putting out of his mind previously expressed views as to an appropriate sentence.

# I

## A

Ahmed Ressam is an Algerian national. Traveling on a false Moroccan passport issued in the name of Nassar Ressam, Ressam left Algeria in 1992 and went to France. On November 8, 1993, French authorities deported Ressam to Morocco and banned him from returning to France for three years. Ressam was returned to France by Moroccan authorities when it was determined that he was not Moroccan.

On February 20, 1994, Ressam arrived at Mirabel Airport in Montreal, Canada, using an illegally altered French passport in the name of Anjer Tahar Medjadi. The passport was altered in that Ressam's photo had been inserted to replace that of the original bearer. When Canadian immigration personnel confronted Ressam with the altered passport, Ressam divulged his true name. Ressam applied for refugee status with Canadian Immigration, indicating on this application that he left Algeria in December 1993 after having been arrested and jailed for 15 months for arms trafficking to terrorists in Algeria. Ressam's request for refugee status in Canada was denied on June 6, 1995. His appeal was also denied. A moratorium on deportations from Canada to Algeria, however, allowed Ressam to stay in Canada under conditions set by Citizenship and Immigration Canada (CIC). Ressam failed to comply with these conditions, and on May 4, 1998, a warrant was issued by CIC for Ressam's arrest. Ressam was not arrested however, because at the time the warrant was issued, he was attending a terrorist training camp in Afghanistan.

On March 17, 1998, traveling under the name of Benni Noris, Ressam went from Montreal to Karachi, Pakistan. In Karachi, Ressam got in touch with Abu Zubeida who was in charge of the Afghan terrorist training camps. Ressam was told to grow a beard and wear Afghani clothes, prior to being transported across the border from Pakistan into Afghanistan. While Ressam was in Afghanistan, fatwahs were issued, including one by Sheikh Omar Abdel Rahman, directing the terrorists to fight Americans and hit their interests everywhere.

Between March 1998 and February 1999, Ressam attended three training camps for Islamic terrorists in Afghanistan. Ressam first received instruction at Khalden Camp in light weapons (handguns, machine guns, and rocket launchers), the making of explosive devices (including TNT, C4 (plastic explosive), and black plastic explosives), sabotage, the selection of targets, urban warfare, tactics (including assassinations), security, and the use of poisons and poisonous gas. The sabotage training included learning how to blow up the infrastructure of a country, including the enemies' special and military installations, such as electric plants, gas plants, airports, railroads, and hotels where conferences are held. The urban warfare training instructed on how to carry out operations in cities, how to block roads, how to assault buildings, and covered the strategies used in these operations. Explosives training included how to do surveillance, take pictures, and blend in by wearing clothing that a tourist would wear. The weapons and ammunition used at the camps were supplied by the Taliban. Plans were underway to carry out terrorist operations in Europe and elsewhere.

After attending Khalden Camp, Ressam moved to Toronta Camp located outside Jalalabad, Afghanistan, where he was trained in the manufacture of explosives over the course of a month and a half. Ressam learned how to put chemical substances together to form explosives and how to make electronic circuits to be used to blow things up.

Ressam and five other terrorists were part of a cell charged with carrying out an operation against a target in the United States — an airport or a consulate — before the end of 1999. The leader of the cell was to stay in touch with Abu Jaffar in Pakistan and Abu Doha in Europe. The plan was for the cell members to travel separately and meet in Canada where they would carry out bank robberies to finance their operation in the United States. Other cells were planning operations in Europe and in the Persian Gulf against the United States and Israeli interests to be carried out before the year 2000.

In February 1999, Ressam returned to Canada, traveling under the name Benni Noris and carrying: $12,000 in cash; a chemical substance called Hexamine, which is used as a booster in the manufacture of explosives; and, a notebook with instructions on how to put together explosives.

In the spring of 1999, French authorities were conducting an investigation of radical Islamic fundamentalists living in Montreal who were believed to be providing support to Islamic terrorist organizations in Europe. The Montreal "cell" was involved in stealing passports and other identification documents and sending them to other cells in Europe to allow fellow Islamic extremists to travel internationally. The French authorities requested an interview of Ressam but the Canadian authorities were unable to locate him because he was living under his false name of Benni Noris.

In the summer of 1999, Abu Doha informed Ressam, from London, that the other members of the Montreal cell decided to remain in Europe because they ran into problems with Immigration. Ressam decided to continue with the operation without the other members of his cell. Ressam targeted an airport, knowing that as a result, many civilians would die. While planning the operation, Ressam worked with his friend, Ahcene Zemiri, who helped him plan a bank robbery intended to secure funds to finance the attack in the United States. Ressam and Zemiri did surveillance on the bank. Ressam asked

Zemiri and Samir Ait Mohamed to get a pistol with a silencer, and hand grenades to use during the bank robbery. Ressam planned to throw a live hand grenade at the police, and run, if he needed to do so in order to get away.

On November 17, 1999, Ressam and his co-conspirator, Abdel Dahoumane, traveled from Montreal to Vancouver, B.C., where they prepared explosives for the LAX bomb in a rented cottage. On December 14, 1999, Ressam and Dahoumane traveled from Vancouver to Victoria, B.C., with all of the components of the bomb, including explosives, hidden in the wheel well of the trunk of a rental car. Continuing alone, Ressam drove the car carrying the explosives onto an American car ferry, M/V COHO, at Tswassen, B.C. Before boarding the ferry, a U.S. Immigration and Naturalization Service inspector checked Ressam's documentation and destination. Ressam provided the inspector with a fraudulent Canadian passport in the name of Benni Noris and stated that he was heading to Seattle. Because the ferry was not the typical route from Vancouver to Seattle, the inspector decided to search the car. The inspector failed to check the hidden wheel well in the trunk, however, and Ressam was allowed to board the ferry. The M/V COHO arrived in Port Angeles, Washington later that evening. Upon leaving the ferry, Ressam was questioned by U.S. Customs Inspector Diane Dean. Inspector Dean detected nervousness and directed Ressam to a secondary inspection area.

Ressam filled out a custom's declaration form falsely, stating his name was Benni Norris and that he was a Canadian citizen. One customs inspector conducted a pat-down search on Ressam as others were searching the car. When an inspector discovered what appeared to be contraband in the wheel well of the trunk, Ressam fled on foot. Customs inspectors gave chase. In the course of the chase, Ressam attempted to carjack a vehicle. He was apprehended by the customs inspectors and returned to the inspection area in a police car. The inspectors resumed searching the trunk of Ressam's car.

Believing the contraband to be narcotics, the inspectors did not handle the items as carefully as one would handle explosives. As the inspectors reached into the wheel well to remove the items, Ressam ducked down behind the protection of the police car door.[1] An explosives expert later determined that the materials found in the car were capable of producing a blast forty times greater than that of a devastating car bomb.

Following his arrest, Ressam was indicted on nine counts relating to his attempt to carry out an act of terrorism transcending a national boundary. The statutory maximum penalty for these offenses was 130 years in prison.

Before trial, the Government offered Ressam a sentence of 25 years imprisonment in exchange for a guilty plea. The Government considered the sentence offered to be a substantially discounted offer, taking into account the risk of litigation. Prior to trial, the Government characterized its evidence with regard to Count One, Conspiracy to Commit an International Act of Terrorism Transcending National Boundaries,

---

[1]The following items were found in Ressam's car:

> two lozenge bottles filled with primary explosives, one of which contained hexamethylene triperoxide diamine (HMTD) and the other of which contained cyclotrimethylene trinitramine (RDX); 10 plastic bags of approximately 118 pounds total of urea in fine white powder form, which is a fertilizer that, when nitrated, can be used as a fuel in explosives; 2 plastic bags of about 14 pounds total of a crystalline powder determined to be aluminum sulfate; two 22-ounce olive jars each filled approximately 3/4 full of a golden brown liquid covered with a sawdust like substance, which liquified was determined to be an explosive, etheylene glycol dinitrate (EGDN). Also discovered with these chemicals were four timing devices, comprised of small black boxes which each contained a circuit board connected to a Casio watch and nine-volt battery connector. Tests later confirmed that the timing devices were operational. Ressam's fingerprints and hair were found in some of the timing devices.

Government's Ex Parte Motion and Order re: Letters Rogatory, March 3, 2000.

the most serious charge and the one that carried the most weight, as very thin. The Government was concerned about its ability to prove what Ressam intended to do once he crossed the border, using a phony passport and carrying over 100 pounds of explosives. It was in fact not until during trial, that some of the most important evidence was developed with regard to what Ressam intended to do with the explosives. Ressam rejected the pre-trial plea offer of 25 years.

In preparing its case for trial, the Government enlisted the services of judicial and law enforcement agencies from several other countries. Due to the unavailability of certain law enforcement witnesses in Canada, and the fact that certain other witnesses expressed fear of testifying against Ressam at trial, the district court granted the Government's motion to take foreign depositions in Canada. Order of District Court granting Government's motion for foreign depositions, June 23, 2000. Due to possible prejudice by public sentiment in the Seattle area, the trial judge granted Ressam's motion to transfer the site of the trial to Los Angeles. On April 6, 2001, following a 19-day trial involving approximately 120 witnesses and over 600 exhibits, a jury convicted Ressam on all counts. The sentence exposure for these convictions under the then-mandatory Sentencing Guidelines was 65 years to life.

**B**

On May 4, 2001, prior to sentencing, counsel for Ressam informed the United States Attorneys' Office that Ressam wished to cooperate with it and law enforcement authorities in the investigation of terrorist activities. On May 10, 2001, Ressam began meeting with Government agents in an attempt to cooperate. Ressam's position was that the United States Attorney should agree upon a sentencing range of 10 to 15 years in prison in exchange for his cooperation. On June 22, 2001, the United States Attorney responded to Ressam's offer with a letter agreement memorializing the parties' understanding that Ressam would cooperate with law enforcement "in

hopes of earning a motion for a downward departure [in his sentence] pursuant to U.S.S.G. 5K1.1." Ressam signed the agreement the next day. The cooperation agreement required Ressam's full compliance with the terms of the agreement, his full cooperation with designated agencies, and his truthful testimony before the grand jury, and in other court proceedings with respect to any matters as requested by the U. S. Attorney's Office for the Western District of Washington or the Southern District of New York, including but not limited to the trial of his accomplice and co-conspirator Mokhtar Haouari and any future prosecutions brought in connection with the participation by Ressam and others in Canada, Afghanistan, and elsewhere in a conspiracy to kill United States nationals.

In exchange, the United States Attorney agreed to file a 5K1.1 motion asking the judge for a downward departure from the then-mandatory Sentencing Guidelines. *Id.* The parties agreed that neither side would request a sentence less than 27 years imprisonment. *Id.*

Between May 10, 2001 and September 11, 2001, Ressam met with Government agents approximately 22 times. On July 5, 2001 and July 6, 2001, Ressam testified as a prosecution witness at the trial of his co-conspirator, Mokhtar Hauoari. The evidence at Haouari's trial established that he conspired with Ressam and Abdelghani Meskini to support Ressam's terrorist plot to bomb LAX. *United States v. Mokhtar Haouari*, S4-00-cr-15, 2001 WL 1154714, at *2-4 (S.D.N.Y. Sept. 28, 2001). Hauoari supported Ressam by recruiting Meskini to assist Ressam in the United States, and by providing him with money, a credit card and false identification. Meskini pleaded guilty and also testified against Hauoari. Under the terms of Meskini's plea agreement, he received six years imprisonment. Hauoari was sentenced to 24 years in prison, two years short of the statutory maximum.

On July 2, 2001, based almost entirely upon information provided by Ressam, the United States Attorney for the

Southern District of New York filed a complaint against Abu Doha, a major player in the arena of terrorist activity. Ressam was aware that the success of the Government's attempts to extradite Doha from England depended exclusively upon a comprehensive declaration provided by Ressam.

After the terrorist attacks that occurred on September 11, 2001, Ressam identified Zacarias Moussaoui from a photograph as an individual he had met at the Khalden training camp. Ressam also provided information that assisted law enforcement in determining that the shoe confiscated from Richard Reid, the so-called "Shoe Bomber," was a complete device that needed to be disarmed before being put on a plane for transport to a lab for analysis.

Relying on Ressam's continued cooperation, on October 26, 2001, the United States Attorney for the Southern District of New York filed a complaint against Samir Ait Mohamed. Ressam was aware that he would figure as a prominent Government witness in that case.

By November 28, 2001, six months after entering into the cooperation agreement with the United States Attorney, Ressam began showing reluctance to discuss certain matters. FBI Special Agent Humphries, who worked with Ressam from the commencement of his cooperation with the Government, testified that in a June 23, 2001 interview, Ressam had talked with him at length about Nacer Hamaidi, an individual in Vancouver, British Columbia, who had assisted Ressam in: obtaining fraudulent Canadian social security numbers; driving Ressam to the DMV for the purpose of obtaining a driver's license in a fraudulent name, the Benni Antoine Noris name; driving him to the Royal Bank, where he opened an account under the Benni Antoine Noris name; driving Ressam to the downtown Vancouver business licensing office where he was able to apply for and obtain the Benni import/export license. Ressam explained to Agent Humphries that Hamaidi advised him on an individual living in Alberta, Canada, who

worked for the DMV, which is privatized in Alberta, and who for a sum of $500 furnished Mr. Ressam with a true Alberta driver's license in the name Benni Antoine Noris. That license was subsequently surrendered to the Quebec driver's license authority to obtain a Quebec driver's license in that name. Hamaidi knew that Ressam had been to the training camps because he drove him to the bus station the night he left Canada to go to Afghanistan for training. And he was the first person in Vancouver Ressam met and called upon when he came back into North America from Afghanistan training camps.

This information was passed on to Canadian authorities who were critically interested in trying to ensure that they could identify individuals who may be in a position to assist criminals intent on carrying out attacks upon the United States. When officers from the Royal Canadian Mounted Police ("RCMP") traveled to the United States to interview Ressam in late 2001 in connection with their ongoing investigation of Nacer Hamaidi, however, Ressam had decided that he would no longer discuss Hamaidi. Agent Humphries testified that the RCMP officers were disappointed that Ressam was not staying consistent with information he had previously provided. Agent Humphries intervened and spoke to Ressam but Ressam did not want to discuss Hamaidi. Agent Humphries testified that this was the first time there was a disconnect in the rapport with Ressam.

Between September 11, 2001 and February 11, 2002, Ressam met with Government agents on approximately 15 occasions, including his participation in a deposition hearing in New York related to prosecutions taking place against criminal defendants in Germany. On February 11, 2002, nine months after Ressam began his cooperation with the Government, Ressam's counsel met with members of the United States Attorneys' Office and sought to renegotiate the terms of the parties' cooperation agreement. According to Ressam's counsel, he was suffering from anxiety related to his impend-

ing sentence, his conditions of confinement were compromising his physical and mental well-being, and he wanted closure. The prosecution responded to Ressam's complaint about the conditions of his confinement in the FDC SeaTac Special Housing Unit by reminding him that these conditions were influenced by the nature of his criminal acts and the serious charges for which he now stands convicted. The prosecution offered to assist Ressam in getting into the Witness Security Program, designed for prisoners in federal custody, which could result in a less onerous housing situation for Ressam, albeit at some distance from Seattle. Ressam declined to take the prosecution's offer.

In response to Ressam's request to renegotiate the terms of his cooperation agreement, the prosecution stated that Ressam's cooperation to date was not of a nature to lead them to consider dissolving the 27 year sentence recommendation floor. The prosecution also noted that based on the cooperation to date, they would not recommend a sentence in the 27 year range. The prosecution stated, however, that its final recommendation would reflect Ressam's further efforts to cooperate in future debriefing sessions and in providing testimony. Considering Ressam's sentencing exposure, the prosecution added that it was in Ressam's interest to fulfill his promised cooperation and earn a departure motion.

The district court granted several sentencing continuances to allow Ressam to cooperate further with the Government.[2]

---

[2]Ressam was originally scheduled to be sentenced on June 28, 2001. On June 18, 2001, just prior to Ressam entering into the cooperation agreement with the prosecution, the district court continued the sentencing to July 25, 2001. On July 5, 2001, the district court continued Ressam's sentencing to September 20, 2001. On September 7, 2001, sentencing was continued to February 14, 2002. On December 13, 2001, sentencing was continued to April 3, 2002. On December 19, 2001, sentencing was rescheduled for March 29, 2002. On March 13, 2002, the prosecution moved for a nine-month continuance to allow Ressam "the opportunity to fulfill the terms of his promised cooperation." Ressam did not object to the prosecution's request for a nine-month continuance. The district court continued the sentencing to March 13, 2003. It was later rescheduled to February 26, 2003.

Ressam continued cooperating until early 2003. Over the course of his two-year cooperation, he provided 65 hours of trial and deposition testimony, and 205 hours of proffers and debriefings. Ressam provided information to the governments of seven different countries and testified in two trials, both of which ended in convictions of the defendants. He provided names of at least 150 people involved in terrorism and described many others. He also provided information about explosives that potentially saved the lives of law enforcement agents, and extensive information about the mechanics of global terrorism operations.

On February 19, 2003, the prosecution filed a motion for a continuance of Ressam's sentencing and requested an adjournment pursuant to the terms of his cooperation agreement with the Government. The prosecution argued that the request was reasonable and pointed out that Ressam's co-conspirator, Abdelghani Meskini, another cooperating defendant who pleaded guilty and testified against Ressam at trial, was continuing to provide the Government with valuable information, and there were no plans to sentence him any time soon. The prosecution reminded the district court that it had offered over a year earlier to transfer Ressam to another prison to address the adverse impact his conditions of confinement may be having on his state of mind, but his counsel had objected to such a transfer. The prosecution further informed the district court that, relying on Ressam's promise to cooperate, Abu Doha had been ordered extradited by the Magistrate Court in London to the United States for prosecution. Also relying on Ressam's promise to cooperate, the Government was in the process of extraditing Samir Ait Mohamed from Canada. The prosecution stated in its motion that it had not yet decided on its position with respect to a § 5K1.1 motion and that if forced to make a motion now, the prosecution would likely make a sentencing recommendation calling for a considerably longer period of incarceration that we might if Ressam had completed his promised cooperation.

On February 26, 2003, the district court held a hearing on the prosecution's motion for a continuance. At the hearing, the district court asked the prosecution how it would respond if the court were to grant their continuance conditioned upon the immediate filing of a 5K motion for a downward departure based upon Ressam's cooperation. That same day, the prosecution filed a motion pursuant to U.S.S.G. Section 5K1.1, seeking a sentence below the otherwise applicable guideline range based on Mr. Ressam's substantial assistance in the case of *United States v. Mokhtar Haouari*, a matter prosecuted in the Southern District of New York in the summer of 2001. *Haouari,* 2001 WL 1154714, at *2. The district court set a status conference for October 2003.[3] Despite the § 5K1.1 motion, however, Ressam indicated he was unwilling to continue cooperation. By April 2003, he refused to provide a written statement to British officials concerning an individual who was a member of his own terror cell.

Concerned about Ressam's state of mind and demeanor, in October 2003 Ressam's counsel consulted with Dr. Stuart Grassian, a Board-certified psychiatrist specializing in evaluating the psychological effects of stringent conditions of imprisonment. Dr. Grassian met with Ressam in November 2003 and concluded that his conditions of confinement played a very significant role in explaining the deterioration of his state of mind. In February 2004, Dr. Grassian met in New York City with Ressam's counsel, members of the United States Attorneys' Office, and behavioral science experts from the FBI. It was decided that Ressam would be moved to a prison environment that would afford him much more environmental, social, and occupational stimulation. The transfer was effected in June 2004. Dr. Grassian met with Ressam again in October 2004 and observed that he appeared to be much less tense, more relaxed, and his thinking was strikingly

---

[3]The scheduled status conference was continued several times and finally occurred on July 9, 2004. On that date, sentencing was scheduled for February 17, 2005. It was later continued to April 27, 2005.

clearer. Dr. Grassian reported that Ressam realized that he had made a solemn promise to cooperate, and that his refusal to continue to testify and speak with the Government could likely have serious adverse consequences in regard to his sentence and his custody status. Nevertheless, by November 2004, Ressam's counsel made it clear that his cooperation was finished and that he wanted to be sentenced.

A sentencing hearing was held on April 27, 2005. The parties each filed sentencing memoranda. Contrary to the terms set forth in the June 23, 2001 cooperation agreement, Ressam requested a sentence of 150 months imprisonment. Ressam's position was that the starting point should be the prosecution's pre-trial plea offer of 25 years, rather than the Sentencing Guidelines range of 65 years to life. The prosecution recommended a sentence of 35 years imprisonment, arguing that by breaching his agreement with the United States Attorneys' Office, Ressam had effectively terminated at least two criminal cases of vital interest to national security.

The prosecution acknowledged that Ressam had provided valuable assistance to the United States and to foreign authorities. For that reason, despite Ressam's breach of the cooperation agreement, the prosecution recommended a 35-year sentence, which was a substantial reduction from the 65 year bottom of the otherwise applicable Guidelines range that Ressam would face absent cooperation.

Agent Humphries, who was involved throughout the duration of Ressam's cooperation, testified concerning the information received from Ressam and its usefulness. Agent Humphries stated that Ressam's information was helpful in that it provided a personal account of his matriculation from North America through Europe to Pakistan through safehouses into Afghanistan. Agent Humphries testified that most of the information Ressam provided to the FBI had previously existed within the U.S. intelligence community in classified realms, but Ressam served as an unclassified vehicle, which

the FBI could use to relay the previously classified information to other law enforcement and intelligence services throughout the world. Additionally, the prosecution filed a summary of debriefings, proffers, and testimony provided by Ressam in support of the sentencing memorandum to be filed by Ressam on a later date.

At the sentencing hearing, Ressam argued that his cooperation was worth a greater reduction in his sentence. Ressam argued that he ceased cooperating, in part, because he was having trouble remembering details. Ressam submitted a psychiatric report prepared by Dr. Grassian wherein he opined that the combination of solitary confinement and repeated interrogations had a negative impact on Ressam's mental health. Dr. Grassian further stated that Ressam's history provided strong evidence that he would not be a danger to our community. Dr. Grassian also noted in his report that Ressam wondered if the Government might be willing to let him live in the United States after his release from prison. Relying on Dr. Grassian's report, Ressam argued that he was experiencing some very serious cognitive issues.

In assessing Ressam's cooperation, the district court commented that the United States Attorney's pre-trial offer of a sentence of 25 years "might have some relation to the post-trial assessment of the case with a level of cooperation." Sentencing Hr'g Tr. at 15, April 27, 2005.

The district court stated to Ressam's counsel:

> One of the things that baffles me, Mr. Hillier, is I made it clear in an in-chambers conference with you and the government that I wanted to be able to give Mr. Ressam as much credit as I could for cooperation. And that, what happened between that session, which was a month ago or a few weeks ago, and the time of this sentencing, could be translated into years of time. And I'm mystified that he insists upon going

> ahead with the sentencing today, rather than waiting
> to see what happens with Doha and the Canadian
> case. Can you shed any light on that, without violat-
> ing your privilege?

*Id.* at 106-07. The district court also commented that "it
strikes me that a lot of the details that he's not remembering
now are things that one would not forget." *Id.* at 109. At the
district court's urging, Ressam asked for a three-month con-
tinuance of the sentencing hearing to allow him to consider
whether he was willing to cooperate further in the prosecu-
tions of Doha and Mohamed. The prosecution objected, argu-
ing that Ressam should decide then and there whether he was
willing to cooperate fully, and that it was disingenuous to
believe that his memory would suddenly improve. The district
court concluded that Ressam's reaction to the request for con-
tinued cooperation suggested "there's reason for optimism
that his cooperation will improve." *Id.*

On July 27, 2005, the district court held a sentencing hear-
ing and heard argument from both sides, which largely mir-
rored the arguments presented at the April 27, 2005 hearing.
The Court sentenced Ressam to 22 years imprisonment.

Ressam appealed from his conviction for carrying an explo-
sive during the commission of a felony. *United States v. Res-
sam*, 474 F.3d 597 (9th Cir. 2007). In a cross-appeal, the
prosecution challenged Ressam's sentence as unreasonable in
light of his decision to cease cooperating and to recant his
prior statements. *Id.* This Court reversed the conviction for
carrying explosives during the commission of a felony,
vacated Ressam's sentence, and remanded for resentencing,
without addressing the merits of the prosecution's arguments
as to the reasonableness of the sentence.[4] *Id.* The United

---

[4]This Court vacated the sentence on the ground that the reversal of the
conviction for Count Nine would require a new sentencing hearing. *Res-
sam*, 474 F.3d at 604. It declined to address the merits of the Govern-

States Supreme Court reversed this Court's decision that the prosecution had failed to prove each of the elements of the crime of carrying explosives during the commission of a felony. *United States v. Ressam*, 128 S. Ct. 1858 (2008). On remand, this Court vacated the sentence and remanded for resentencing because the district court had failed to determine the applicable Guidelines range, as required under *United States v. Carty*, 520 F.3d 984 (9th Cir. 2007) (en banc), *cert. denied sub nom. Zavala v. United States*, 128 S. Ct. 2491 (2008). *United States v. Ressam*, 538 F.3d at 1167 (9th Cir. 2008).

## C

While the matter was on appeal, on November 11, 2006, Ressam sent a letter to the district court recanting the testimony he provided in the trial of Haouari. Ressam stated:

> I write this letter to you in regard to "the allegation" of the prisoner "Mr. Hassan Zamiry" [also spelled Ahcene Zemiri] who is in Guantanamo prison in the Island of Cuba.

---

ment's argument as to the reasonableness of Ressam's sentence in part because:

> the law applicable to sentencing is in flux. We are rehearing two cases en banc, *United States v. Carty*, 453 F.3d 1214 (9th Cir. 2006) *reh'g en banc granted*, 462 F.3d 1066 (9th Cir. 2006), and *United States v. Zavala*, 443 F.3d 1165 (9th Cir. 2006) *reh'g en banc granted*, 462 F.3d 1066 (9th Cir. 2006), and the United States Supreme Court has granted writs of certiorari in *Claiborne v. United States*, 127 S. Ct. 551 (Nov. 3, 2006) (No. 06-5618), and *Rita v. United States*, 127 S. Ct. 551 (Nov. 3, 2006) (No. 06-5754), which will have a good deal to say about the sentencing process in the wake of *United States v. Booker*, 543 U.S. 220 (2005).

*Id*.

The allegation: Is that Mr. Hassan Zamiry had provided aid and support for the operation I carried out. This is not right, it is false.

. . .

When I dealt with Prosecutor at the beginning, I was in shock and had a severe psychological disorder as I result [sic] of the court results. I was not sure about m[y] statements.

. . .

Mr. Hassan Zamiry is innocent and has no relation or connection to the operation I was about to carry out. He also did not know anything about it and he did not assist me in anything.

Ressam had previously claimed that Ahcene Zemiri provided him money and a video camera to aid in Ressam's plot, and that Zemiri was going to assist him in an armed robbery that was to be committed in Montreal to obtain funds for the plan. When Ressam began cooperating with the Government, Zemiri fled from Canada and was later captured in Afghanistan and brought to Guantanamo as a prisoner based, at least in part, on Ressam's statements. Zemiri's habeas petition is pending before the United States District Court for the District of Columbia. *See Zemiri v. Obama*, No. 04-cv-2046 (D.D.C. filed Nov. 19, 2004).

Similarly, in a letter dated March 28, 2007 to the United States Attorneys' Office, Ressam purported to recant his previous testimony against Haouari. In the letter, Ressam claims that he was not mentally competent when he testified against Haouari and that Haouari "is an innocent man." *Haouari v. United States*, 510 F.3d 350, 352 (2d Cir. 2008). Haouari submitted Ressam's letter as "newly discovered evidence" sufficient to warrant the filing of a second or successive 28 U.S.C.

§ 2255 motion. *Id*. Haouari's motion pursuant to § 2255 was denied. *Id.*

**D**

At the resentencing hearing, the district court began by calculating the applicable Sentencing Guidelines range for Ressam's crimes of conviction at 65 years to life, including a ten-year mandatory prison sentence for Count Nine. Before imposing its sentence, the district court heard from the parties regarding the sentence it should impose in conformity with this Court's mandate.

Appearing in pro se, Ressam told the district court that he wished to recant his testimony against his co-conspirator Maktar Haouari, and all statements made before the grand jury implicating Abu Doha and Samir Ait Mohamed, two known terrorists considered to be "major players" in the al-Qaeda network. Ressam made the following statement before the district court at his sentencing hearing:

> I suffered severe shock after the trial and I lost my mental faculty and I did not know what I was saying. The government attorney and the investigator, they know about my mental condition that I was going through, and about my mental faculty and the procedure exposed to their own interests. They interpret some of my statements to suit their interests. And the statements that was put in my mouth, which I said yes, because — due to the extreme mental exhaustion I was going through. I also am subject of pressure put upon me by the attorneys and the investigators.
>
> The evidence presented in court should be obtained from a solid source that cannot be doubted. But if the evidence and the statements are obtained from dubious sources or under pressure of a threat or

from a mental incompetent source it should not be admitted. And that is the situation I was in.

I sent in the past a letter to the government attorney Joe Bianco, in which I retrieved all my statements that I gave in the investigation in the past; all those I gave during the testimony of Makhtar Haouari in the New York court because I neither proceed my mental faculties [sic] or I know what I was saying.

The New York judge was suspicion of my letter, and he thought that I was doing that because — and I did not because in order — He thought that I was doing that because I had nothing to lose and because I was already tired [sic]. I did not that in order to win or lose. First, I did that because I was not mentally competent and I did not know what I was saying. Second, I did that because — in the presence of that judge. I retract all. I repeat, all of the statements that I made in the past and do not want my word counted in my trial. So sentence me to life in prison or as you wish. I have no objection to your sentencing.

I want from you and from the New York justice to take another look as to Mokhtar Haouari case. Sentencing should set when the evidence at hand is absolute, and look if the evidence is in doubt it would be preferable to rescind the decision. I go to different subject.

I will move to case about Abu Doha and Samir Mohamed. Previously the government attorney called me, Bruce, about to testify in the case of Abu Doha and Samir Mohamed in front of a jury in New York. At the beginning I refused, and then I accept because I could not find an alternative to that. And

also in order to appear at the earliest possible time in court for my sentencing.

The later reason will affect the case of Abu Doha and Samir Mohammed and cause their cases to be dismissed in America.

When I appeared in front of the jury in New York I retrieved almost all the statements I made in the past as to Abu Doha and Samir Mohammed. I indicate in my earlier statement because I did not know what I was saying.

Sentencing Hr'g Tr. at 10-11, December 3, 2008. Ressam concluded by stating that he had nothing to say about his trial and asked the district court to "[s]entence me to life in prison or anything you wish. I will have no objection to your sentence." *Id.* at 12.

In its argument, the prosecution reiterated the points raised in its November 28, 2008 sentencing memorandum and recommended that Ressam serve a term of life imprisonment, based upon his further recantation and attempts to distance himself from his earlier cooperation. The prosecution argued that the sentence imposed needs "to protect the public from further crimes of the defendant." It also stated:

Ressam's arrest on December 14, 1999, was not the result of a sudden lapse of judgment. It was the culmination of years of planning and work, all aimed at causing as much harm to the United States as he could possibly inflict. Following his conviction in April 2001, Ressam claimed that after he observed the fairness with which the Court treated him throughout the trial, he had a change of heart [and that] he was "firmly against" terrorist operations in America and around the world.

> Ressam's change of heart was short-lived. Ressam has provided no indication that he has repudiated the goals of terrorists to inflict harm on the United States. His decision to end cooperation raises the specter that he continues to pose a real and serious threat to the United States. Ressam's more recent decision to affirmatively help identified terrorists escape responsibility for their actions raises even more serious concerns. At this point in time, this Court [must] address the most fundamental question: at what age would Ressam no longer pose a threat to the people of the United States.

Government's Sentencing Br. at 23-24, November 28, 2008. In this same vein, in addressing Ressam's challenge to the enhanced criminal history score required under U.S.S.G. § 3A1.4, the prosecution urged the district court to consider that "all of the crimes of which Ressam was charged and convicted were directed at achieving his goal of placing a bomb at [LAX]." As the prosecution pointed out in its sentencing memorandum:

> Congress and the Sentencing Commission had a rational basis for concluding that *an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time.*

*Id.* at 19 (citing *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003) (emphasis added)).[5] The prosecution argued that the district court should

---

[5]In *Meskini*, the Second Circuit addressed the question whether the provision of the Guidelines increasing both the offense level and the criminal history category for a felony involving an act of terrorism violated Meskini's right to due process by impermissibly "double counting" the

impose a sentence that affords adequate deterrence for criminal conduct and protects the public from further crimes of this defendant.

The unfortunate reality of today's world, made so abundantly clear last week in Mumbai, is the possibility of future terrorist attacks is a continuing and genuine threat. The sentence this Court imposes on Mr. Ressam must not only act as a deterrent to Mr. Ressam and his future actions, but equally important they must also act as a deterrent to future potential terrorists who are contemplating actions against the United States. It must broadcast the clear message to extremists that when they are caught and convicted they will suffer serious consequences.

During the 2005 sentencing this Court noted that this was probably the most significant sentence anybody ever faced in your long tenure on the bench. I assume as we sit here three years later your opinion hasn't changed. I fully agree with the Court's assessment. The Court must send this defendant away for a long enough period of time so that there is no chance he will ever target innocent victims again.

In addition, the sentence must also send an unequivocal message to extremists that there is a

---

same criminal act. The Second Circuit rejected the claim. The Second Circuit explained that:

> Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation.

*Id.* (emphasis added).

> horrendous price to pay for targeting the United States . . . .

> The Court's July 2005 sentence, if reimposed, would mean that this defendant would be released in ten years, he would be out of jail in 2018. He would be 51 years of age. Think about the defendant's life prior to the arrest in this case, his fanatical commitment to jihad, his single-minded pursuit to attack the United States. Think about his recent decisions to help Abu Doha, Samir Mohamed, his most recent decision to affirmatively help Hassam Zemiri and Adil Charkaoui, and as of today his attempt to withdraw even his cooperation in the trial against Haouari.

Sentencing Hr'g Tr. at 30-31, December 3, 2008. In its sentencing memorandum, the prosecution summarized the value of Ressam's cooperation generally as

> providing testimony in the prosecutions of individuals charged before he began his cooperation (such as the testimony he provided during the trial of Mokhtar Haouari), providing information about explosive devices that was very helpful in determining the nature of the device found in Richard Reid's shoe and providing information that corroborated the information already known by the United States and foreign governments.

> To be sure, the information about trade craft, terrorism organizations, and training camps that Ressam provided was in an unclassified form. Thus this information could be broadly disseminated to law enforcement officers both in the United States and abroad in order to broaden their base of knowledge. While this was of significant value, the information provided was not unique to Ressam.

Perhaps his most valuable information — that leading to the charges against Doah and Mohamed — cannot be credited. Ressam undermined that value when he chose to end his cooperation leading to the dismissal of these charges. . . . [H]e also undermined his other cooperation by recanting earlier statements.

Government's Sentencing Br. at 17-18, November 28, 2008.

At the December 3, 2008 sentencing hearing, the Government explained that Ressam's recantation of his prior statements regarding his terrorist training and the activities of other terrorists, and his decision to cease cooperating, forced the Government to dismiss criminal charges against Doha and Mohamed. The prosecution explained that as a high-ranking al Qaeda member with close ties to Osama Bin Laden, Abu Doha is, without question, one of the most dangerous terrorists ever charged by the United States. After the dismissal of the charges against Doha in the United States, he was released from custody and is currently living in England.

The prosecution argued that Ressam's recantation represents his attempts to affirmatively assist known terrorists and is a strong signal to any objective observer that Ressam's long-held allegiance to radical terrorist beliefs have returned, and that he once again unequivocally is a danger to innocent people throughout the world. The prosecution also argued that Ressam's sentence should reflect the seriousness of the terrorist offenses for which he was convicted, and "send the defendant away for a long enough period of time so there is no chance he will ever target innocent victims again."

The prosecution pointed out that in response to the sentence of 22 years the district court ordered in its earlier sentencing order, Ressam has since recanted his earlier statements made pursuant to the cooperation agreement with the United States

Attorneys' Office. After Ressam recanted, the Government argued that if it had "known in May of 2001 what [it] know[s] today, how this was going to end up, [it] never would have entered into cooperation with this defendant. Any benefit he provided [the Government] initially has been substantially outweighed by his reversal, and [he] now attempts to use his position as a cooperating defendant to help his fellow terrorists."

After hearing from the parties, the district court ordered as follows:

> The Ninth Circuit has made clear that the Sentencing Guidelines are only one factor to be considered among those factors set forth in 18 U.S.C. Section 3553(a), in determining an appropriate sentence. I may not presume that the Guidelines range is reasonable. Nor should the Guidelines factor be given more or less weight than any other factor. Accordingly, I have also considered the other Section 3553 factors in arriving at the sentence I am imposing today.

> On the one hand I recognize the need for the sentence imposed to reflect the seriousness of the offenses Mr. Ressam has committed, to provide just punishment for those offenses, and to promote respect for the law. Mr. Ressam's crimes, if carried to their intended conclusion, would have resulted in the deaths and injuries of hundreds of innocent people and instilled fear across the country and even the world. Fortunately, Mr. Ressam's arrest prevented such an outcome. Because of the work of an attentive Port Angeles Customs Inspector, Mr. Ressam's crimes did not lead to loss of life or limb, nor destruction of property. Nevertheless, the seriousness and heinousness of the act of terrorism Mr. Ressam was carrying out at the time of his arrest cannot be understated.

On the other hand, I recognize Mr. Ressam's extensive and valuable cooperation in the fight against terrorism during the first two years after his trial. Although it ended unwisely and prematurely, Mr. Ressam's cooperation, unique in its breadth and scope, weighed heavily in my initial sentencing decision and its import has not changed in my analysis today. The government's 5K1.1 motion filed in February 2003 requested downward departure from the Sentencing Guidelines based on Mr. Ressam's substantial assistance in the case of *United States versus Mokhtar Haouari*, a matter prosecuted in the Southern District of New York in the summer of 2001 and resulting in the conviction of Mr Haouari.

Mr. Haouari was sentenced in 2002 to a term of 24 years' imprisonment. Mr. Ressam's testimony at the trial connected Mr. Haouari to the terrorist plot, of which Mr. Ressam himself was a part, to bomb the Los Angeles International Airport on New Year's Day 2000. In addition to his substantial cooperation in that case Mr. Ressam also testified before a German tribunal on behalf of the German government in the trial against Mounir Motassadeq . . . . [i]n December 2002, which resulted in a conviction and sentence of 15 years.

The Court recognizes that Mr. Ressam's later decision to end his cooperation resulted in the dismissal of two pending prosecutions and the retraction of certain of his statements against two other terrorist suspects. However, Mr. Ressam's cooperation, while it lasted, provided the United States government and the governments of Great Britain, Spain, Italy, Germany, France and Canada extensive intelligence that proved to be invaluable in the fight against international terrorism. The defendant's sentencing memorandum submitted before the July

2005 sentencing hearing summarizes the far-reaching impact of Mr. Ressam's cooperation on the investigations and prosecutions of terrorist activities in this country and abroad.

Downplaying the cooperation that Mr. Ressam provided the government would diminish the likelihood of future cooperation by other apprehended terrorists. Further, doing so would not be fair to Mr. Ressam. After his trial he told me that the fairness of his trial was not what he expected, given what he had done. The fair treatment that Mr. Ressam received in his public trial was a major influence on his decision to break with his past and cooperate, a choice that undoubtedly saved innocent lives. In making that decision, he put his own life at risk. In addition, he has spent many years in solitary confinement in a country far from his family and loved ones and will, by any measure, be sacrificing a large portion of his life to pay for his crimes.

I believe that the sentence I am imposing today will serve as a deterrent while promoting respect for the American rule of law by demonstrating the fairness of our federal court system rather than merely its punitiveness.

In addition, I have taken into account Mr. Ressam's history and characteristics. Reading Mr. Hilier's 2005 sentencing memorandum and the report from Dr. Grassian leads me to the conclusion that Mr. Ressam's life history and personal characteristics support favorable sentencing consideration. His life and reasons for involvement in his crime do not support a conclusion that he is a good person, but it also deserves consideration. Mr. Hilier describes a quiet, solitary and devout man whose true character is manifest in his decision to cooperate. Through the

course of the trial and immediately thereafter, Mr. Ressam wrestled with what he had done and why. As Mr. Hilier put it, Mr. Ressam determined that violent action brought shame to the concerns he was trying to promote, and that as a result what he was doing was harmful in all respects.

I have also taken into account the nature of Mr. Ressam's crimes required that he be held in solitary confinement for upwards of four years, if not for the likely entirety of his sentence. This isolation is exacerbated by the fact that he does not speak English and has no opportunity for visits by friends and family abroad. These harsh conditions of confinement necessarily set Mr. Ressam's situation apart from that of the typical criminal sentencing. I am also persuaded that Mr. Ressam's health deteriorated somewhat from the isolation of his confinement and that the repetitive, intensive questioning to which he submitted, and that these conditions contributed to the early termination of his cooperation.

Moreover, I have considered the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

Sentencing Hr'g Tr. at 35-38, December 3, 2008.

The district court discussed "other terrorism-related prosecutions around the country," and "a recent study of 124 defendants sentenced in terrorism trials in American federal courts since September 12, 2001" which concluded that "the average term of imprisonment was a little over eight years." *Id.* at 39. The district court stated that these cases "did not influence [its] decision in determining an appropriate sentence in this case." *Id.* The district court discussed sentences in other terrorist cases, none of which involved attacks, or attempted

attacks within the United States, "to provide a backdrop against which Mr. Ressam's conviction and sentence may be viewed." *Id.* The court explained:

> I note that none of the defendants in these cases cooperated as extensively, providing as much valuable information to the fight against terrorism as Mr. Ressam did. As I emphasized earlier, Mr. Ressam's cooperation provided authorities in this country and abroad with an unprecedented view of the inner workings of al Qaeda that almost certainly thwarted future attacks. In fact, it was the extent of Mr. Ressam's cooperation in the conviction of one of his co-conspirators that resulted in the government filing a 5K1.1 motion, specifically requesting that Mr. Ressam be sentenced below the applicable guideline range.
>
> Therefore, based on all the factors listed in 18 U.S.C. Section 3553, I hereby reimpose a sentence of 22 years and a period of supervised release of five years subject to the standard conditions, together with those additional conditions set forth in the presentence report. I recognize that the sentence I am imposing reflects a significant downward deviation from the advisory guideline range. However, I believe the factors I have examined on the record are sufficiently compelling to support the degree of the variance.

*Id*. at 41-42.

## II

The Government appeals the sentence imposed on Ressam by the district court. It argues that "[t]he sole issue presented in this case is whether the sentence imposed on Ahmed Ressam is substantively unreasonable in light of the facts of this

case and the factors set forth in 18 U.S.C. § 3553(a)."[6]
(Appellant's Opening Br. 36.) Specifically, the Government

---

[6]Title 18 U.S.C. § 3553(a) requires that a sentencing court consider the following factors:

   (1)   the nature and circumstances of the offense and the history and characteristics of the defendant;

   (2)   the need for the sentence imposed—

       (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

       (B)   *to afford adequate deterrence to criminal conduct*;

       (C)   *to protect the public from further crimes of the defendant*; and

       (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

   (3)   the kinds of sentences available;

   (4)   the kinds of sentence and the sentencing range established for—

       (A)   the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .

   (5)   any pertinent policy statement . . .

   (6)   the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

   (7)   the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

Accordingly, in *Carty*, we instructed that "[t]he overarching statutory charge for a district court is to 'impose a sentence sufficient, but not greater than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." *Carty*, 520 F.3d at 991 (citing 18 U.S.C. § 3553(a)(1)-(2)); *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007)).

argues that the sentence is substantively unreasonable because the district court failed adequately to consider and weigh the relevant § 3553(a) factors, including "the need [for the sentence imposed] . . . to ensure the public is protected from future crimes by this defendant."[7] (*Id.* at 51.)

The Government also argues that:

> the [district] court's stated reasons simply do not establish the reasonableness of a sentence two-thirds less than the low end of the advisory Guideline[s] range for a defendant who was convicted after trial of such extraordinary crimes, and then undermined the prosecution of two terrorists about whom he provided information by refusing to finish his agreed upon cooperation.

(*Id.* at 38.)

## A

Ordinarily, when a sentence is appealed, "[o]n appeal, we

---

[7]Thus, "[t]here is a procedural as well as a substantive element to this argument." *United States v. Overton*, 573 F.3d 679, 699 (9th Cir. 2009) (concluding that appellant "allude[d] to procedural error by accusing the district court of failing to address the § 3553(a) factors and adequately explain the sentence imposed"); *see also United States v. Paul*, 561 F.3d 970, 974 n.2 (9th Cir. 2009) ("It is the procedural provisions of 18 U.S.C. § 3553(c) that require engagement with the [parties'] arguments . . . not the substantive provisions of 18 U.S.C. § 3553(a)."). In its appeal, however, the Government has expressly waived any challenge to the procedural correctness of the sentence imposed by the district court. (Appellant's Opening Br. 36) ("The Court must first determine whether the district court committed significant procedural error, *a claim not raised in this appeal*. The Court must then consider whether the sentence is substantively unreasonable, the issue raised here.") (citations omitted) (emphasis added); (Appellant's Reply Br. 5) ("*A sentence is reviewed first for procedural error, although none is alleged here.*") (citation omitted) (emphasis added).

first consider whether the district court committed significant procedural error, then we consider the substantive reasonableness of the sentence." *Carty*, 520 F.3d at 993. In *Gall*, the Supreme Court instructed that:

> [r]egardless of whether the sentence imposed is inside or outside the Guidelines range, the appellate court must review the sentence under an abuse-of-discretion standard. It must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence — including an explanation for any deviation from the Guidelines range. Assuming that the district court's sentencing decision is procedurally sound, the appellate court should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard. When conducting this review, the court will, of course, take into account the totality of the circumstances, including the extent of any variance from the Guidelines range.

*Gall*, 552 U.S. at 51.

In this appeal the Government has elected not to argue that the district court committed significant procedural errors. Though the Government has identified many alleged missteps by the district court in the course of sentencing, its opening brief affirmatively states that procedural error is "a claim not raised on this appeal." *Id.*

**[1]** Ressam contends that as a result we are precluded from considering procedural errors by the district court, citing the decision of the Supreme Court in *Greenlaw v. United States*, 554 U.S. 237, 128 S. Ct. 2559 (2008). In that case the Eighth

Circuit sua sponte ordered the imposition of a longer criminal sentence based on the failure of the district court to impose a mandatory minimum sentence, which the court of appeals identified as a plain error even though the Government had not appealed the sentence. The sentence was before the court of appeals because the defendant had challenged the sentence, contending that it was too long. The Supreme Court held that the court of appeals had erred by acting in the absence of a Government appeal or cross-appeal. *Greenlaw*, 128 S. Ct. at 2570. But that is not the situation here. The Government has appealed Ressam's sentence. That it has elected to focus on the substantive reasonableness of the sentence means that we are not required to review for procedural errors, but it does not mean that we are precluded from looking at the process that produced that sentence.

That is especially true here, where the Government's opening brief on appeal complains about a number of actions or failures by the district court that arguably constitute procedural errors. *See United States v. Overton*, 573 F.3d 679, 699 (9th Cir. 2009) (reviewing for procedural error where appellant challenged his sentence as substantively unreasonable but "allude[d] to procedural error by accusing the district court of failing to address the § 3553(a) factors and adequately explain the sentence imposed"); *United States v. Shaw*, 560 F.3d 1230, 1238 (11th Cir. 2009) (reviewing for procedural error even though the only contention on appeal was that the sentence was substantively unreasonable). Notably, the Government's arguments in this case are largely grounded upon the district court's alleged failure adequately to consider and weigh each of the relevant § 3553(a) factors, including "to protect the public from further crimes of the defendant," and to explain its reasons for imposing a sentence 43 years below the low end of the Sentencing Guidelines range. *See Carty*, 520 F.3d at 993 (holding that "[i]t would be procedural error for a district court to fail to . . . consider the § 3553(a) factors . . . or to fail adequately to explain the sentence selected,

including any deviation from the Guidelines range") (citing *Gall*, 128 S.Ct. at 596-97).

**[2]** It should not be surprising that a challenge to the substantive reasonableness of a sentence will, in at least some cases, invite consideration of the process that produced the sentence. How a decision is arrived at can often shed light on the merit of the decision itself. Indeed, "substantive problems . . . [can be] a product of the District Court's procedurally flawed approach." *United States v. Goff*, 501 F.3d 250, 256 (3d Cir. 2007). In *Carty* we held that "[i]n determining substantive reasonableness, we are to consider the totality of the circumstances, including the degree of variance for a sentence imposed outside the Guidelines range." *Carty*, 520 F.3d at 993. The totality of circumstances to be considered in determining substantive reasonableness may surely include an examination of the sentencing process as a whole.

**B**

To better understand the relationship between alleged procedural errors and substantive unreasonableness, it would be useful to analyze each of the two concepts in some detail.

**1**

In *Carty*, we addressed the question whether "the district court imposed a procedurally flawed sentence by failing to provide sufficient reasons for selecting a sentence at the bottom of the Guidelines range rather than a lesser sentence." *Carty*, 520 F.3d at 995. We held that

> [i]t would be procedural error for a district court to fail to calculate — or to calculate incorrectly — the Guidelines range; to treat the Guidelines as mandatory instead of advisory; to fail to consider the § 3553(a) factors; to choose a sentence based on clearly erroneous facts; or to fail adequately to

explain the sentence selected, including any devia-
tion from the Guidelines range.

*Id.* at 993. We concluded that the district court committed no
procedural error in sentencing Carty to a within Guidelines
sentence because "[a]lthough the judge gave no explicit rea-
sons for [the sentence imposed], the arguments were straight-
forward and uncomplicated . . . ." *Id.* In a "typical case"
which is "neither complex nor unusual," applying the Guide-
lines "will not necessarily require lengthy explanation" to
comply with proper sentencing procedure. *Id.* at 995. (citing
*Rita v. United States*, 551 U.S. 338, 127 S. Ct. 2456, 2468
(2007) (finding no error and holding that "given the straight-
forward, conceptually simple arguments before the judge, the
judge's statement of reasons here, though brief, was legally
sufficient")); *see also United States v. Amezcua-Vasquez*, 567
F.3d 1050, 1054 (9th Cir. 2009) (same).

**[3]** What *Carty* left unclear is whether a sentence is proce-
durally flawed where the district court fails to provide "suffi-
cient reasons" for selecting a sentence that is well below the
Sentencing Guidelines range, and where "the arguments [are
not] straightforward and uncomplicated," and if so, what
explanation will be deemed "sufficient" or "adequate" to pass
procedural muster. *Carty*, 520 F.3d at 995. Based upon our
reading of *Rita*, *Gall*, and *Carty*, we conclude that such a sen-
tence would be procedurally flawed. We will now probe the
parameters of what constitutes a procedurally "sufficient" or
"adequate" explanation by a district court in imposing a sen-
tence in a complex or complicated case where the sentence
deviates significantly below the advisory Sentencing Guide-
lines range.

**a**

It is now well established that the district court must begin
a sentencing hearing "by determining the applicable Guide-
lines range." *Carty*, 520 F.3d at 991. The Guidelines "range

must be calculated correctly," as the Sentencing Guidelines are "the starting point and the initial benchmark." *Id.* (quotations and citations omitted). "[F]ailing to calculate (or improperly calculating) the Guidelines range" constitutes "significant procedural error." *Gall*, 552 U.S. at 51.

Recognizing that "a Guidelines sentence 'will usually be reasonable,' " we declined in *Carty* "to embrace a presumption." 520 F.3d at 994 (quoting *Rita*, 127 S. Ct. at 2465). However, we held that when a sentencing "judge 'decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.' " *Carty*, 520 F.3d at 991 (quoting *Gall*, 128 S. Ct. at 597). As the Court explained in *Gall*, it is "uncontroversial that a major departure should be supported by a more significant justification than a minor one." *Gall*, 552 U.S. at 50. This is because "[w]hen a sentence is within the Guidelines range, we know that 'both the sentencing judge and the Sentencing Commission . . . have reached *the same conclusion*' that the sentence is 'proper.' " *Carty* 520 F.3d at 996 (Kozinski, C.J., concurring) (emphasis in original) (quoting *Rita*, 127 S. Ct. at 2463).

Thus, once the correct Guidelines range has been established, "[t]he district court may not presume that the Guidelines range is reasonable." *Carty*, 520 F.3d at 991. Rather, "[t]he district court must make an individualized determination based on the facts." *Id.* at 991. In reaching its sentence decision, the "district courts must . . . remain cognizant of [the Guidelines] throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6; *see Carty*, 520 F.3d at 991 (the Guidelines "are to be kept in mind throughout the [sentencing] process") (citing *Gall*, 128 S.Ct. at 596-97 n.6)).

Where the sentence imposed falls within the Sentencing Guidelines range, it is reasonable to conclude that the district court remained "cognizant" of the Sentencing Guidelines. The

harder question arises where, as here, the sentence falls significantly outside the Guidelines range. This raises two questions. First, are we to conclude that a procedural error has been committed if it appears from the record that the district court did not "remain cognizant of [the Sentencing Guidelines] throughout the sentencing process"? *Gall*, 552 U.S. at 50 n.6. Second, if the answer to the first question is "yes," what steps must a district court take to demonstrate that it has "kept [the Sentencing Guidelines] in mind throughout the process" and thus avoid committing such an error. *Carty*, 520 F.3d at 991.

**[4]** We answer the first question in the affirmative. Where the district court imposes a sentence significantly outside the Guidelines range, and it appears from the record that the district court did not "remain cognizant of [the Sentencing Guidelines] throughout the sentencing process," *Gall*, 552 U.S. at 50 n.6, it has committed procedural error. To hold otherwise would be to construe the Supreme Court's instruction in *Gall* as a suggestion rather than a requirement. Our reading of *Gall* does not permit such an interpretation. *See id*. ("The fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process."). Accordingly, in imposing a sentence significantly outside the Guidelines range, there must be some indication in the record that the district court had the Guidelines "in mind throughout the process." *Carty*, 520 F.3d at 991.

**b**

After determining the applicable Sentencing Guidelines range, the district court must give the parties "a chance to argue for a sentence they believe is appropriate." *Carty*, 520 F.3d at 991. Failure to do so will constitute procedural error. *Gall*, 552 U.S. at 50 n.6 (listing factors to be considered in reviewing for procedural error).

**c**

"The district court should then consider the § 3553(a) factors to decide if they support the sentence suggested by the parties." *Carty*, 520 F.3d at 991 (citing 18 U.S.C. § 3553(a)(1)-(7); *Gall*, 128 S.Ct. at 596-97 n.6). "It would be procedural error for a district court . . . to fail to consider the § 3553(a) factors." *Id.* at 993.

**d**

A district court also commits procedural error if it "choose[s] a sentence based on clearly erroneous facts." *Carty*, 520 F.3d at 993. "A finding is clearly erroneous when although there is evidence to support it, the reviewing body on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622 (1993) (internal quotation marks and citation omitted). By way of example, in *Levinson*, the Third Circuit concluded that the district court based its decision on a clearly erroneous premise when it found that Levinson, who was convicted of tax fraud involving a specific dollar loss to the United States Treasury, had inflicted no financial harm on the public. *Levinson*, 543 F.3d at 199.

**e**

Most important for purposes of review is the requirement that the district court "adequately . . . explain the sentence selected, including any deviation from the Guidelines range." *Carty*, 520 F.3d at 993. Failure to provide an adequate explanation is procedural error. *Id.* at 992 (holding that "the district court must explain [the sentence] sufficiently to permit meaningful appellate review"). The explanation "is most helpful [if it] come[s] from the bench, but adequate explanation in some cases may also be inferred from the PSR [pre sentence report] or the record as a whole." *Id.* at 992.

As we explained in *Carty*, "[w]hat constitutes a sufficient explanation will necessarily vary depending upon the complexity of the particular case, whether the sentence chosen is inside or outside the Guidelines, and the strength and seriousness of the proffered reasons for imposing a sentence that differs from the Guidelines range." *Id*.

With regard to the district court's consideration of the § 3553(a) factors, "[w]e assume that district judges know the law and understand their obligation to consider all of the § 3553(a) factors." *Id*. For this reason, "[t]he district court need not tick off each of the § 3553(a) factors to show that it has considered them." *Id*. "Nor need the district court articulate in a vacuum how each § 3553(a) factor influences its determination of an appropriate sentence." *Id*. However, "when a party raises a specific, nonfrivolous argument tethered to a relevant § 3553(a) factor in support of a requested sentence, then the judge should normally explain why he accepts or rejects the party's position." *Id*. at 992-93 (citing *Rita*, 127 S. Ct. at 2468) ("Where the defendant or prosecutor presents nonfrivolous reasons for imposing a different sentence . . . the judge will normally go further and explain why he has rejected those arguments."); *see also Goff*, 501 F.3d at 255 ("Although the District Court is not required either to comment on every argument counsel advances or to make findings as to each § 3553(a) factor, it nevertheless should expressly deal with arguments emphasized by the parties.").

Thus, other than addressing specific and nonfrivolous arguments raised by the parties, a district court need not offer much in the way of explanation to demonstrate that it has satisfied this requirement in imposing a sentence within the advisory Sentencing Guidelines. *Carty*, 520 F.3d at 992 ("A within-Guidelines sentence ordinarily needs little explanation . . . because both the Commission and the sentencing judge have determined that the sentence comports with the § 3553(a) factors and is appropriate in the ordinary case.").

We did not hold in *Carty* that a district court's failure to address nonfrivolous arguments raised by a party in support of a requested sentence would constitute procedural error. It is axiomatic, however, that if review of the reasonableness of a sentence is hindered by the district court's failure to address specific arguments that are "tethered to a relevant § 3553(a) factor in support of a requested sentence," meaningful appellate review is not possible and the sentence is by definition procedurally flawed. *Id.* at 992-93; *see also Rita*, 551 U.S. at 356 ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."). This reasoning applies equally to sentences both within and outside the advisory Guidelines range.

**f**

In addition to the § 3553(a) factors, a district court may also consider the defendant's assistance in the investigation and prosecution of another person who has committed an offense. *United States v. Zolp*, 479 F.3d 715, 721 (9th Cir. 2007) ("[T]he district court did not err by considering Zolp's cooperation as part of its analysis under 18 U.S.C. § 3553(a) rather than as part of its advisory guidelines calculation."). "The Guidelines 'afford[ ] the sentencing judge' wide 'latitude' in evaluating the 'significance and usefulness of the defendant's assistance,' but direct courts to give 'substantial weight . . . to the government's evaluation' of that assistance." *United States v. Awad*, 371 F.3d 583, 586-87 (9th Cir. 2004) (citing U.S.S.G. § 5K1.1(a)(1) & cmt. background); *see also* U.S.S.G. § 5K1.1 cmt. n.3 (providing that "[s]ubstantial weight should be given to the government's evaluation of the extent of the defendant's assistance, particularly where the extent and value of the assistance are difficult to ascertain").

When determining the appropriate extent of a substantial-assistance downward departure, the district court should consider the following five factors:

(1) the court's evaluation of the significance and use-fulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered; (2) the truthfulness, complete-ness, and reliability of any information or testimony provided by the defendant; (3) the nature and extent of the defendant's assistance; (4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance; [and] (5) the timeliness of the defendant's assistance.

U.S.S.G. § 5K1.1(a). When imposing a sentence that is well below the advisory Guidelines range pursuant to a § 5K1.1 motion, however, there must be some indication that the district court's departure is justified. *See United States v. Haack*, 403 F.3d 997 (8th Cir. 2005) (examining the reasonableness of the sentence against the five factors outlined in U.S.S.G. § 5K1.1 and concluding that imposition of a 78-month sentence was not justified where the Guidelines range was 180 months and the assistance the defendant provided consisted of information regarding others who were either already under indictment or were suspects); *see also United States v. Livesay*, 525 F.3d 1081, 1093 (11th Cir. 2008) (vacating and remanding sentence where the district court did not adequately explain its assessment of Livesay's cooperation or the sentence imposed).

**2**

Once an appellate court has concluded that no procedural error has occurred, it must review sentences for substantive reasonableness. *Carty*, 520 F.3d at 993. "A substantively reasonable sentence is one that is 'sufficient, but not greater than necessary' to accomplish § 3553(a)(2)'s sentencing goals." *United States v. Crowe*, 563 F.3d 969, 977 n.16 (9th Cir. 2009) (quoting 18 U.S.C. § 3553(a)); *see also United States v. Vasquez-Landaver*, 527 F.3d 798, 804-05 (9th Cir. 2008) (affirming sentence as reasonable where the record shows the

district court considered the § 3553(a) factors and imposed a sentence that was sufficient but no greater than necessary to comply with § 3553(a)); *United States v. Rodriguez-Rodriguez*, 441 F.3d 767, 771 (9th Cir. 2006) (same).

"The touchstone of 'reasonableness' is whether the record as a whole reflects rational and meaningful consideration of the factors enumerated in 18 U.S.C. § 3553(a)." *United States v. Tomko*, 562 F.3d 558, 568 (3d Cir. 2009) (quoting *United States v. Grier*, 475 F.3d 556, 571 (3d Cir. 2007) (en banc); *see also United States v. Williams*, 425 F.3d 478, 481 (7th Cir. 2005) ("[W]hat we must decide is whether the district judge imposed the sentence he or she did for reasons that are logical and consistent with the factors set forth in section 3553(a).").

"In determining substantive reasonableness, we are to consider the totality of the circumstances, including the degree of variance for a sentence imposed outside the Guidelines range." *Carty*, 520 F.3d at 993.

With these standards in mind, we turn now to the case before us.

## III

The Government argues that based upon the unusual record in this case, the district court has failed adequately to explain its reasons for imposing a sentence "two-thirds less than the low end of the advisory Guidelines range." The Government's chief argument is that because Ressam is a trained terrorist who has led a life of crime, devoted years of his life to planning, coordinating, and attempting to execute an attack on the public that would result in massive destruction and death within the United States, a longer sentence is needed to accomplish the purposes of § 3553(a).

The Government argues that the district court overstated the value of Ressam's cooperation while giving little or no

weight to other relevant § 3553(a) factors. The value and quality of the assistance rendered by Ressam, the Government contends, "simply do not justify the extraordinary reduction granted by the court in this case." Appellant's Opening Brief at 43. Although Ressam provided a great deal of information about his training as a terrorist and the terrorist acts of others, the Government argues that most of his cooperation merely declassified previously known information. *Id.* at 44. The Government stressed that the district court did not give sufficient weight to the fact that Ressam ceased cooperation, recanted his earlier testimony, and thus caused the criminal complaint against two terrorists to be dismissed. *Id.* at 45-46. "[R]ewarding Ressam with a minimum forty-three-year reduction in sentence for failure to complete his cooperation sends" the message "that regardless of whether you violate your agreements or complete your bargain, you will be rewarded handsomely by the court." *Id*. at 48.

The Government argues that the district court failed to consider the timing of Ressam's decision to cooperate, which did not occur until after he had been convicted and was facing a possible life sentence. *Id*. at 48-49. The Government argues further that such a significant reduction in sentence results in an unreasonable sentence because it gives too little weight to the other relevant § 3553(a) factors, does not promote respect for the law, provide just punishment for the crime, or afford adequate deterrence to criminal conduct. *Id.* at 51. The Government also contends that the sentence fails to protect the public from future crimes by Ressam because he will be 53 years old upon release from prison.

The Government maintains that Ressam's prison conditions should not have been considered because Ressam refused the Government's offer to place him in the more hospitable Witness Security Program. *Id*. at 52-53. Finally, the Government argues that the district court's comparisons of sentences imposed in other terrorism cases do not establish the reasonableness of Ressam's sentence. *Id.* at 55.

**A**

"[T]he abuse-of-discretion standard of review applies to appellate review of all sentencing decisions — whether inside or outside the Guidelines range." *Gall*, 552 U.S. at 49. We have characterized our review for procedural error in sentencing decisions as a review for "procedural reasonableness." *Amezcua-Vasquez*, 567 F.3d at 1053; *see also United States v. Grissom*, 525 F.3d 691, 696 n.2 (9th Cir. 2008). "An estimation of the outer bounds of what is 'reasonable' under a given set of circumstances may not always be beyond debate, but the abuse-of-discretion standard by which that estimation must be judged limits the debate and gives district courts broad latitude in sentencing." *Levinson*, 543 F.3d at 195 (vacating sentence as procedurally erroneous where district court offered inadequate explanation for downward variance in sentence).

In *Grissom*, we explained that a "review for questions of procedural reasonableness" requires reviewing "the district court's interpretation of the Sentencing Guidelines de novo, the district court's application of the Sentencing Guidelines to the facts of a case for abuse of discretion, and the district court's factual findings for clear error." 525 F.3d at 696 & n.2 (quoting *United States v. Cantrell*, 433 F.3d 1269, 1279 (9th Cir. 2006), and explaining that nothing in *Gall* or *Carty* provides for an abuse of discretion standard of review for procedural error different from the standard set forth in *Cantrell*). In *United States v. Wise*, 515 F.3d 207 (3d Cir. 2008), the Third Circuit explained the review standard as follows:

> We review the district court's decision under an abuse-of-discretion standard . . . but the amount of deference we give will depend on the type of procedural error asserted on appeal. For example, a district court will be held to have abused its discretion if its decision was based on a clearly erroneous factual conclusion or an erroneous legal conclusion. . . .

> *Koon v. United States*, 518 U.S. 81, 100 (1996) ("A district court by definition abuses its discretion when it makes an error of law."); *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 401 (1990) ("When an appellate court reviews a district court's factual findings, the abuse-of-discretion and clearly erroneous standards are indistinguishable: A court of appeals would be justified in concluding that a district court had abused its discretion in making a factual finding only if the finding were clearly erroneous."). Thus, if the asserted procedural error is purely factual, our review is highly deferential and we will conclude there has been an abuse of discretion only if the district court's findings are clearly erroneous . . . . On the other hand, we do not defer to a district court when the asserted procedural error is purely legal, as, for example, when a party claims that the district court misinterpreted the Guidelines.

*Wise*, 515 F.3d at 217.

Under the abuse of discretion standard of review recently announced in *United States v. Hinkson*, 585 F.3d 1247 (9th Cir. 2009), we first consider whether the district court identified the correct legal standard for decision of the issue before it, and then "determine whether the district court's findings of fact, and its application of those findings of fact to the correct legal standard, were illogical, implausible, or without support in inferences that may be drawn from facts in the record." *Id*. at 1251.

"For a non-Guidelines sentence, we are to 'give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance.' " *Carty*, 520 F.3d at 993 (quoting *Gall*, 128 S.Ct. at 597). "We may not reverse just because we think a different sentence is appropriate." *Id.*

## B

There are four procedural errors in the district court's analysis that are serious enough to cause us to lack confidence in the substantive reasonableness of the sentence that was imposed: (1) the district court failed to use the Guidelines as a starting point and to "remain cognizant" of them throughout the process in reaching Ressam's sentence; (2) the district court failed to explain why it was rejecting the Government's argument as to the value of Ressam's cooperation, and failed to address the impact of Ressam's recantation and timeliness of his decision to cooperation; (3) the court clearly erred when it credited Dr. Grassian's assessment of Ressam's life history and personal characteristics, and that of Ressam's counsel, in view of the contradictory factual findings in the PSR; and, (4) the district court erred in failing to address the Government's argument that a longer sentence is required to protect the public from future crimes committed by Ressam, who will be only 53 years old when his sentence expires. We address each error in turn.

## 1

**[5]** The district court calculated the applicable Guidelines range at the beginning of the sentencing hearing. At the end of its analysis, the court stated in a conclusory manner that it had considered the Guidelines range as one factor, given it the same weight as the other § 3553 factors, and that it recognized the sentence reflects "a significant downward deviation from the advisory guideline range." Beyond these passing references to the Guidelines, the district court made no attempt to explain how it settled on a sentence that was 43 years below the low end of the Guidelines range.

Rather, the record suggests that the district court agreed with Ressam's position that the starting point for calculating his sentence should be the Government's pre-trial plea offer of 25 years. At the resentencing hearing, the Government

argued that using the pre-trial offer as a starting point was legally improper. Sentencing Hr'g Tr. at 14, December 3, 2008. The Government attempted to dispel the district court of its earlier stated belief that the Government's pre-trial offer of a sentence of 25 years "might have some relation to the post-trial assessment of the case with a level of cooperation," *supra* at 23, by explaining that 25 years was "not an appropriate sentence in the view of anyone on the government's team." Sentencing Hr'g Tr. at 14, December 3, 2008. The district court stated that it was not convinced, replying: "I have a hard time accepting that." *Id*. at 15.

**[6]** Based upon our review of the record, beyond performing the calculation of the Guidelines range at the beginning of the hearing and referencing the Guidelines twice in passing, the district court did not appear to give any weight whatsoever to the Guidelines range. Therefore, the record does not demonstrate that the district court used the applicable Guidelines range as "the starting point and initial benchmark" as required. *Carty*, 520 F.3d at 991.

Our perception that the district court failed to keep the applicable Guidelines range in mind throughout sentencing is bolstered by how the district court dealt with the mandatory minimum and consecutive sentence requirements that pertained to certain counts of Ressam's conviction. The conviction on Count Nine (carrying an explosive during the commission of a felony) requires a mandatory minimum sentence of at least 10 years, under 18 U.S.C. § 844(h)(2). In addition, consecutive sentences are required for the convictions for Count Nine and also for Count One (act of terrorism transcending a national boundary, in violation of 18 U.S.C. § 2332b(a)(1)(B)). *See* 18 U.S.C. §§ 844(h)(2) and 2332b(c)(2), respectively.

The 10-year mandatory minimum for Count Nine meant that Ressam was sentenced to only 12 years for his convictions on the other eight counts combined, a portion of which

represented the consecutive sentence for the Count One con-
viction. That period of 12 years was divided into seven years
for violating 18 U.S.C. § 2332b(a)(1)(B) (Count One) and
five years for the seven remaining counts (Counts Two
through Eight).[8]

Those component parts reveal that Ressam's sentence actu-
ally involves an even greater departure below the Guidelines
than is initially apparent. Ressam's total sentence of 22 years
is only 34 % as long as the low end of the combined Guide-
lines range of 65 years, but his seven-year sentence for Count
One is only 28 % of the Guidelines recommendation of 300
months, and his five-year sentence for the remaining seven
counts is only 17 % of the Guidelines minimum recommenda-
tion of 360 months.

---

[8]The Government, not the district court, chose the length of each por-
tion of Ressam's sentence. When the district court first imposed Ressam's
sentence, it considered only the total term of imprisonment and asked "the
government to allocate [22 years] according to the statutory minimums
among the counts in consecutive and concurrent [terms] as necessary to
arrive at" the total. Sentencing Hr'g Tr. at 31, July 27, 2005. The district
court did not revisit the components of the total sentence at the 2008 sen-
tencing hearing. The parties did not brief the question—which we do not
reach—whether the district court's decision not to determine and impose
independent sentences for each of the three consecutive terms was error.
*See* U.S.S.G. § 5G1.2; *cf. United States v. Franklin*, 499 F.3d 578, 584-85
(6th Cir. 2007) ("When any downward variance of the guideline range is
based upon the effect of a mandatory sentence, congressional intent is
repudiated, just as if the mandatory sentence itself had been reduced.");
*United States v. Roberson*, 474 F.3d 432, 437 (7th Cir. 2007) ("The dis-
trict judge was . . . required to determine the proper sentence for the bank
robbery entirely independently of the section 924(c)(1) add-on."). *But see*
*United States v. Vidal-Reyes*, 562 F.3d 43, 55-56 (1st Cir. 2009) ("[T]his
provision merely specifies that the sentence for counts subject to a manda-
tory consecutive sentence should be calculated separately from the
[Guidelines sentencing range] on other counts. In other words, those
counts involving mandatory sentences should be excluded from the group-
ing procedures that would otherwise apply.") (citing *United States v. A.B.*,
529 F.3d 1275, 1276 n.1 (10th Cir. 2008)).

**[7]** Additionally, simply acknowledging that the sentence reflects "a significant downward deviation from the advisory guideline range" is insufficient on this record to demonstrate that the court "remain[ed] cognizant of [the Guidelines] throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6; *Carty*, 520 F.3d at 991 (the Guidelines "are to be kept in mind throughout the [sentencing] process" (citing *Gall*, 552 U.S. at 50 n.6.)); *see also United States v. Pugh*, 515 F.3d 1179, 1200 (11th Cir. 2008) (vacating and remanding sentence where the sentence failed to reflect the seriousness of defendant's offense and the district court did "not give any real weight to the Guidelines range in imposing the sentence").

**[8]** *United States v. Mohamed*, 459 F.3d 979 (9th Cir. 2006), demonstrates the level of explanation that a district court must provide when imposing a sentence that differs substantially from the Guidelines range. Mohamed was convicted of making a false bomb threat to the Department of Homeland Security, claiming that four of his acquaintances were terrorists involved in a plot to bomb shopping malls in Los Angeles, California. *Id.* at 981. "After expending considerable resources to protect against the threat and identify its perpetrator, law enforcement officials located and arrested Mohamed." *Id.* He was convicted and sentenced to a prison term of five years for violating 18 U.S.C. § 844(e), which prohibits the use of a telephone to make a threat regarding an attempt to "destroy a building, vehicle, or other real or personal property by means of fire or an explosive." *Id.* (quoting 18 U.S.C. § 844(e)). In imposing a 60-month sentence, the district court deviated considerably from the Guidelines range of 12 to 18 months. *Id* at 989. We observed that "the sentencing guidelines anticipate their own inadequacy in the context of bomb threats" which include "a particularly wide range of conduct." *Id.* at 988. The district court "noted both the callousness and costliness of the [bomb] threat . . . [and] observed that Mohamed had exploited the nation's fear of al Qaeda in light of the terrorist attacks of September 11." *Id.* at 988. The district court also noted that

the guidelines failed to take into account "the history and characteristics of the defendant" and the need to provide the public with adequate protection from him. See 18 U.S.C. §§ 3553(a)(1), (2)(C). While the PSR rated Mohamed as having a minimal criminal history, the record suggests that he has engaged in a more extensive pattern of misconduct. A federal investigation had linked him to the fraudulent use of driver's licenses in Texas and in California, to the theft of $13,000 from a restaurant in Houston where he was briefly employed, to the fraudulent use of a social security number to open an account at the Bank of America, and to a failure to report for an interview with the FBI regarding other suspicious activities. On top of this, the defendant had been living illegally in the country for several years and had reentered the country illegally just prior to his arrest.

*Id*. at 988-89. On this record, this Court concluded in *Mohamed* that the district court had "thoroughly explained its decision to deviate from the advisory guidelines" and that "it was reasonable for the district court to hold that the advisory guidelines did not adequately take into account Mohamed's significant history of increasingly serious criminal activity." *Id*. at 989. By contrast, here, the district court offered no analysis or explanation as to why its considerable deviation from the Guidelines was appropriate. The absence of such a thorough explanation prohibits meaningful appellate review and thus constitutes procedural error.

**2**

In determining the sentence reduction due to Ressam for his cooperation with the Government, the district court was to consider (1) its own evaluation of the significance and usefulness of Ressam's assistance, taking into consideration the Government's evaluation of the assistance rendered; (2) the truthfulness, completeness, and reliability of any information

or testimony provided by Ressam; (3) the nature and extent of the Ressam's assistance; (4) any injury or risk of injury to Ressam or his family resulting from his assistance; and (5) the timeliness of the Ressam's assistance. *See* U.S.S.G. § 5K1.1(a). We review the reasonableness of Ressam's sentence against these five factors. *Haack*, 403 F.3d at 1004.

**[9]** In considering the first factor, the district court failed to explain why it rejected the Government's arguments concerning its evaluation of Ressam's cooperation, including the value to law enforcement of the information provided. *See Awad*, 371 F.3d at 586-87 (district courts are to give substantial weight to the Government's evaluation of that assistance) (citing § 5K1.1 providing, in Application Note 3, that "[s]ubstantial weight should be given to the government's evaluation of the extent of the defendant's assistance, particularly where the extent and value of the assistance are difficult to ascertain"). *See also United States v. Richardson*, 521 F.3d 149, 158 (2d Cir. 2008) (vacating and remanding sentence where the court was unable to determine whether the sentence was procedurally or substantively unreasonable because the district court failed to explain the method employed in calculating the value of defendant's assistance to the Government).

In *Richardson*, the Government made a motion for a downward departure under U.S. Sentencing Guidelines Manual § 5K1.1 due to defendant's substantial assistance. *Id.* The district court imposed a sentence 93 % below the statutory minimum 20-year sentence on the ground that the Government's § 5K1.1 motion enabled it to exercise discretion to impose a sentence it deemed fair and reasonable under the circumstances. *Id.* (quotations omitted). On appeal, the Second Circuit noted that a motion under § 5K1.1 authorized a trial court to depart below the applicable advisory Guidelines range in determining its sentence, and that an 18 U.S.C. § 3553(e) motion permitted a district court to sentence below a statutory minimum. *Id.* However, in the absence of any explanation by the district court as to the method employed in applying these

two provisions relating to defendant's assistance, the court held that it was unable to determine if the sentence was procedurally or substantively reasonable, particularly due to the substantial departure from the statutory minimum sentence. *Id.*

In addition, the Second Circuit held that the district court did not satisfy its obligation to state the reasons for imposition of its sentence. The district court merely stated that it was taking into account "all the pertinent information including but not limited to the presentence investigation report, submissions by counsel, the factors outlined in 18 U.S.C. Section 3553 and the sentencing guidelines." *Id*. at 155. When counsel for the Government inquired as to the court's method of "calculation," the court responded: "Based on all the circumstances in the case and the motion by the Government, this is the [c]ourt's sentence." *Id*. at 156. The Second Circuit concluded that in the context of that case, the district court failed to satisfy its obligation to "state in open court the reasons for its imposition of the particular sentence." *Id*. at 158, citing 18 U.S.C. § 3553(c). The PSR was no substitute for an explanation by the district court "because the factual findings in the report provided inadequate support for the sentence imposed." *Id.* (citing *United States v. Carter*, 489 F.3d 528, 539-40 (2d Cir. 2007)).

Here, not only did the district court fail to give "substantial weight" to the Government's evaluation of the extent of the defendant's assistance, it failed to give it *any* weight. The district court credited *only* Ressam's assessment of the value of his own cooperation, offering no explanation as to why it was rejecting the Government's assessment. For example, the Government argued that much of the information Ressam provided was "in an unclassified form," and "was not unique to Ressam." Further, Ressam's "most valuable information — that leading to the charges against Doah and Mohamed — cannot be credited [because] Ressam undermined that value when he chose to end his cooperation leading to the dismissal

of these charges." The district court disagreed with the Government's assessment, concluding instead that "Mr. Ressam's cooperation [was] unique in its breadth and scope." The district court also gave much credit to Ressam for his testimony against Haouari without addressing the Government's argument that the value of Ressam's testimony was undermined by his recantations.

The district court cited Ressam's "sentencing memorandum submitted before the July 2005 sentencing hearing [which] summarizes the far-reaching impact of Mr. Ressam's cooperation on the investigations and prosecutions of terrorist activities in this country and abroad." The district court concluded — apparently based upon Ressam's sentencing memorandum — that "Mr. Ressam's cooperation, while it lasted, provided the United States government and the governments of Great Britain, Spain, Italy, Germany, France and Canada extensive intelligence that proved to be invaluable in the fight against international terrorism." Without explanation, the district court suggested that adhering to any but Ressam's version of the value of his cooperation would be to "downplay" it which "would diminish the likelihood of future cooperation by other apprehended terrorists."

**[10]** Turning to the second factor, the district court addressed "the truthfulness, completeness, and reliability" of Ressam's assistance by "recogniz[ing] that Mr. Ressam's later decision to end his cooperation resulted in the dismissal of two pending prosecutions and the retraction of certain of his statements against two other terrorist suspects." The district court did not, however, address the Government's argument concerning the impact of Ressam's early cessation of cooperation or recantations. Within six months of entering into the cooperation agreement with the United States Attorney, Agent Humphries testified that Ressam became less than cooperative and refused to discuss Hamaidi with Canadian authorities who were investigating Hamaidi for his involvement in helping Ressam obtain fraudulent Canadian social security numbers

among other things. The district court did not weigh this or any other specific arguments raised by the Government. The district court noted only that Ressam's cooperation "ended unwisely and prematurely." The district court did not, however, indicate what weight, if any, it gave to this factor. *See e.g., United States v. Burns*, 577 F.3d 887, 890 (8th Cir. 2009) (en banc) (affirming a 60% reduction in the advisory Guidelines sentence where the district court provided a detailed analysis of the § 5K1.1 factors and concluded that there "was no information that the defendant's substantial assistance was anything but a hundred percent complete, a hundred percent truthful, and a hundred percent reliable."); *see also Livesay*, 525 F.3d at 1093 (vacating and remanding sentence where the district court did not explain why it rejected the Government's argument that, notwithstanding Livesay's timely assistance, Livesay should receive "some sentence of significance").

**[11]** The Government also argued that the timing of Ressam's cooperation, the fifth factor to be considered, which occurred only after he had been convicted and was facing a life sentence, should weigh against him in valuing his cooperation. *Id.* at 44. In his February 17, 2003 letter to the trial judge, Ressam stated that he "chose to make a break with the past and agreed to accept [his] guilt and provide the government with all of the information [he] had." Ressam explained that he rejected the "government's offer of a 25-year sentence in exchange for an admission of guilt" because he "expected a miracle" for himself. When he realized "the result was not the miracle [he] had hoped for," he entered into an agreement with the Government and pledged to "honor that agreement even after [he was] sentenced." The district court did not discuss what weight, if any, it was giving to the timing of Ressam's cooperation, a factor generally considered by sentencing courts. *See, e.g., Burns*, 577 F.3d at 890 (affirming a 60% reduction in the advisory Guidelines sentence where the district court provided a detailed analysis of the § 5K1.1 factors and concluded that the timeliness "factor weighs very

heavily in favor of the defendant" because his "timeliness was exceptional").

Furthermore, as in *Richardson*, the PSR in this case is no substitute for an explanation by the district court for its departure from the advisory Guidelines because the factual findings in that report do not provide adequate support for the sentence imposed. *Richardson*, 521 F.3d at 158. The detrimental impact of the district court's failure to address the Government's arguments is compounded here, "where the extent and value of the assistance are difficult to ascertain." U.S.S.G. § 5K1.1 cmt. n.3.

**[12]** Accordingly, we are unable to review whether the district court properly exercised its discretion in analyzing the value of Ressam's cooperation pursuant to the Government's § 5K1.1 motion. *See United States v. Gapinski*, 561 F.3d 467, 469 (6th Cir. 2009) (vacating and remanding sentence as procedurally unreasonable where the record did not show that the district court considered and explained its reasons for rejecting a party's nonfrivolous argument for a requested sentence based upon substantial assistance to the Government).

**3**

**[13]** The district court's finding that "Mr. Ressam's life history and personal characteristics support favorable sentencing consideration" is clearly erroneous in view of the voluminous factual findings in the PSR indicating that Ressam has lead a life of crime dedicated to terrorist causes. Without addressing the Government's arguments as to Ressam's history and characteristics, the district court credited Dr. Grassian's favorable report of Ressam and Ressam's own characterization in his 2005 sentencing memorandum that "by naming and identifying scores of former associates, Mr. Ressam not only has imperiled his life, but also has decisively walked away from the illegality that led to his arrest."

In finding that Ressam is "a quiet, solitary and devout man whose true character is manifest in his decision to cooperate," the district court did not address any of the findings in the PSR which indicate that Ressam has an extensive criminal history. For example, in the summer of 1999, when Abu Doha informed Ressam that the other members of the Montreal cell would not be joining him to carry out the attack against the United States, Ressam decided to continue with the operation on his own, without the other members of his cell. Ressam targeted an airport, knowing that as a result, many civilians would die. Ressam attempted to rob a bank to obtain funds to carry out his mission and finance the attack in the United States. In the course of robbing the bank, Ressam planned to throw a live hand grenade at the police, and run, if he needed to do so in order to get away. These are only a few of the findings in the PSR that are in direct tension with the district court's findings as to Ressam's life history and personal characteristics, including the finding that Ressam is "a quiet, solitary and devout man whose true character is manifest in his decision to cooperate."

**4**

The district court concluded its analysis by stating that "based on all the factors listed in 18 U.S.C. Section 3553, I hereby reimpose a sentence of 22 years and a period of supervised release of five years . . . . I believe the factors I have examined on the record are sufficiently compelling to support the degree of the variance." We disagree.

[14] The district court failed entirely to address the Government's arguments that § 3553(a)(2)(C) requires a district court to weigh the "need to protect the public." This factor is particularly relevant in a terrorist case such as this, where Ressam, who has demonstrated strongly held beliefs about the need to attack American interests in the United States and abroad, will be only 53 years old upon his release.[9] The district court noted

---

[9]The notion that trained terrorists pose a grave danger to the public has also been recognized in the context of pre-trial detention. *See, e.g., United*

generally that "the seriousness and heinousness of the act of terrorism Mr. Ressam was carrying out at the time of his arrest cannot be understated," but did not otherwise discuss the need to protect the public. The failure to do so is procedural error. *See United States v. Lychock*, 578 F.3d 214, 219 (3d Cir. 2009) (vacating and remanding sentence where the district court failed to consider all of the relevant § 3553(a) factors). In *Lychock*, the Third Circuit held that the sentence was procedurally unreasonable because the sentencing proceedings made clear that the district court did not consider one of the relevant § 3553(a) factors. *Id.* "Indeed, the District Court did not even mention this factor despite the fact that, in its sentencing memorandum, the government explicitly invoked this factor." *Id*.

**[15]** Similarly here, the district court did not mention the need to protect the public as a factor it must consider. This omission is particularly troubling here given the nature of Ressam's crimes and the district court's emphasis on Dr. Grassian's favorable psychological assessment of Ressam. In Dr. Grassian's report, the very assessment credited by the district court for purposes of weighing Ressam's history and characteristics, Ressam reported that he regretted having ever cooperated with the Government. The district court did not address the fact that Ressam recanted his testimony or respond to the Government's argument that such recantation affirmatively aided two known terrorists by causing the Gov-

---

*States v. Hir*, 517 F.3d 1081, 1094 (9th Cir. 2008) (affirming order requiring that Hir be detained pre-trial because he was accused of providing support to terrorists and holding that "there is clear and convincing evidence that Abd Hir poses a grave danger to the Philippines (if not to other communities in Southeast Asia) and that 'no condition or combination of conditions will reasonably assure . . . the safety of . . . the community.' ") (citing 18 U.S.C. § 3142(e)); *see also United States v. Goba*, 240 F. Supp. 2d 242, 254 (W.D.N.Y. 2003) (ordering pre-trial detention because each individual defendant's attendance and training at the al-Farooq camp makes him a danger to the community).

ernment to dismiss the indictments against them, signaling that Ressam is not as estranged from the jihad movement as he alleges.

In *United States v. Valnor*, 451 F.3d 744 (11th Cir. 2006), the Eleventh Circuit affirmed a sentence above the high end of the advisory Guidelines range where the district court "concluded that in order to afford adequate deterrence and protect the public from further crimes . . . committed by Mr. Valnor," a longer sentence is appropriate and reasonable. *Id.* at 749. Valnor pleaded guilty to participating in a scheme involving the issuance of fraudulent driver's licences to illegal immigrants and agreed to cooperate with the Government. *Id.* at 746. The Government moved for a downward departure, pursuant to U.S.S.G. § 5K1.1, based on Valnor's substantial assistance, which led to the arrest of 52 people involved in the scheme. *Id.* at 747. The district court rejected the Government's argument for a downward departure, concluding that Valnor's was "a very serious offense." *Id.* at 748. The district court explained that it "[did] not diminish it to the extent that [defense counsel] does, and even to the extent that the government does" *id.*, because

> driver's licenses are far more than simply an authorization to operate a motor vehicle. They serve as the primary means of personal identification, particularly in the absence of a national identification card, and are the first line of defense in national security after 9/11. With a driver's license a person is able to access and integrate into society with the ability, among others, to obtain other documents that he or she would otherwise be unable to acquire. In light of our present security situation, it is of paramount importance that the issuance and distribution of state issued driver's licenses be secured.

*Id.* at 748. The district court explained that even though Valnor was not working within the DMV itself,

he poses a greater [threat] to society than a DMV employee involved in this scheme. Mr. Valnor was intimately . . . involved in the market through which unauthorized individuals obtained driver's licenses. This market is not state regulated, but rather by its very nature operates below the radar of the state and society at large. Therefore, unlike the DMV employee who will never again return to his or her position to commit the same crime, Mr. Valnor as a middleman is free to return to his, quote, market of illegally obtaining and selling driver's licenses validly issued or otherwise.

*Id.* at 749. "After a thorough review of the record, with particular attention to the transcripts from Valnor's three sentencing hearings and the PS[R]," the Eleventh Circuit affirmed Valnor's sentence as reasonable, holding as follows:

The district court was particularly concerned with the following facts, which were relevant to the § 3553(a) analysis: (1) "the egregious nature of the offense" based on its potential impact on national security; (2) that Valnor's sales of license renewals to those who were able to obtain licenses before the 9/11 rule changes, but subsequently could not get renewals, resulted in the provision of licenses to the very people Congress intended to subject to greater regulation in the name of national security; and (3) that unlike in the case of a DMV employee, who could not return to his or her prior position after conviction, there were no safeguards to prevent middlemen like Valnor from returning to the unregulated market of illegally obtaining and selling driver's licenses.

*Id.* at 751. The district court's discussion of the facts relevant to its analysis of the § 3553(a) factors in *Valnor* is illustrative of the kind of discussion required to enable meaningful appel-

late review. *See also United States v. Shy*, 538 F.3d 933, 937 (8th Cir. 2008) (remanding for resentencing "to allow the district court to consider all of Shy's conduct," because meaningful review of the sentence is impossible where the district court failed adequately to explain Shy's sentence with sufficient justifications for the downward variance); *United States v. Thomas*, 498 F.3d 336, 341 (6th Cir. 2007) (vacating and remanding sentence where the district court failed to address a number of arguments raised in defendant's sentencing memorandum regarding application of the § 3553(a) factors, "save the general statement by the district court that it had received, read, and understood the sentencing memorandum" and where "the context and the record [did] not make clear the [district] court's reasoning").

## C

**[16]** The procedural errors identified in the district court's decision rendered the sentence imposed on Ressam both procedurally and substantively unreasonable. Because the sentence is procedurally flawed, meaningful appellate review is foreclosed. Based upon our review of the record before us, however, it appears that the district court abused its discretion in weighing the relevant factors by giving too much weight to Ressam's cooperation and not enough weight to the other relevant § 3553(a) factors, including the need to protect the public. *See, e.g., Paul*, 561 F.3d at 975 (vacating and remanding sentence as substantively unreasonable where the district court gave excessive weight to one factor "while not giving sufficient consideration to other [mitigating] factors" in imposing a sentence at the top end of the Guidelines range); *United States v. Omole*, 523 F.3d 691, 698-700 (7th Cir. 2008) (vacating and remanding sentence that was 51 months below the bottom of the Guidelines range as substantively unreasonable where the sentencing judge failed to offer a compelling justification for a sentence so far below the range and nothing in the record supported such a reduced sentence); *United States v. Rattoballi*, 452 F.3d 127, 136-37 (2d Cir.

2006) (vacating and remanding sentence as unreasonably low where the district court relied upon the history and characteristics of defendant which were neither sufficiently compelling nor present to the degree necessary to support the sentence imposed); *United States v. Crisp*, 454 F.3d 1285, 1289-90 (11th Cir. 2006) (vacating and remanding sentence as substantively unreasonable where the district court gave controlling weight to the need for restitution and did not discuss any of the U.S. Sentencing Guidelines Manual § 5K1.1(a) assistance-related factors when calculating the extent of a U.S. Sentencing Guidelines Manual § 5K1.1(a) departure); *United States v. Hampton*, 441 F.3d 284, 288-89 (4th Cir. 2006) (vacating and remanding sentence where the district court's explanation for dramatic downward variance could not withstand "reasonableness scrutiny" because the sentence was not "supported by compelling justifications related to § 3553(a) factors," and "excessive weight" was given to a single factor); *United States v. Givens*, 443 F.3d 642, 646 (8th Cir. 2006) (vacating and remanding sentence as substantively unreasonable where the district court gave "too much weight" to "defendant's history and characteristics and showed a great deal of sympathy toward him" and gave "not enough [weight] to the other portions of section 3553(a)"); *United States v. Ture*, 450 F.3d 352, 358-59 (8th Cir. 2006) (vacating and remanding sentence as substantively unreasonable where the 18 U.S.C. § 3553(a) factors and the U.S. Sentencing Guidelines Manual did not support the district court's extreme deviation from the recommended Guidelines range and where the district court failed to accord significant weight to the Guidelines range, to the seriousness of the offense, or to the need to avoid unwarranted sentencing disparities).

## IV

**[17]** We conclude that it is appropriate to exercise our supervisory powers under 28 U.S.C. § 2106 and remand this case for resentencing to a different judge. *See, e.g.*, *United States v. Quach*, 302 F.3d 1096, 1103 (9th Cir. 2002)

("Although we generally remand for resentencing to the original district judge, we remand to a different judge if there are 'unusual circumstances.' ") (quoting *United States v. Mikaelian*, 168 F.3d 380, 387 (9th Cir. 1999). In *Mikaelian*, this Court explained that there is a three-factor test to determine whether it is appropriate to remand to a new judge for resentencing:

> (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

168 F.3d at 387-88 (quoting *United States v. Alverson*, 666 F.2d 341, 349 (9th Cir. 1982)). *See also Paul*, 561 F.3d at 975; *United States v. Atondo-Santos*, 385 F.3d 1199, 1201 (9th Cir. 2004*); United States v. Working*, 287 F.3d 801, 810 (9th Cir. 2002); *United States v. Arnett*, 628 F.2d 1162, 1165 (9th Cir. 1979).

In *Paul*, the district court originally sentenced Paul to a high-end Guidelines range of 16 months in prison on his conviction for misappropriation of federal program funds. *Paul*, 561 F.3d at 972. On appeal, this Court determined that the district court failed adequately to consider numerous factors, causing the sentence to be unreasonably high. *Id.* On remand, the original sentencing court ordered a prison term of 15 months, removing only one month from the original sentence. *Id.* at 973. On a second appeal, we again vacated the sentence and remanded for a third sentencing in front of a different district judge. We held that "the appearance of justice will be best preserved by remanding to a different judge." *Id.* at 975. Although on remand the original sentencing judge explained

some of the reasoning for imposing a fifteen month sentence, "he clearly did not put out of his mind his previously expressed view that the defendant's abuse of trust trumped all other mitigation factors combined, as shown by the fact that he again sentenced Paul to a prison sentence at the top of the Guidelines range." *Id.*

Similarly, in *United States v. Working*, the defendant's sentence was twice vacated and remanded for a third sentencing before a different judge. Working was originally sentenced to one day in prison for assault with intent to commit first degree murder, and a mandatory five-year prison term for use of a firearm during a crime of violence. *Id.* at 805. On appeal from the one-day sentence, this Court held that the district court was within its discretion to grant a downward departure from the Guidelines, but the district court must give reasons to justify the extent of the departure. *Id.* Upon remand, the district court again imposed a one-day sentence, basing its decision on numerous factors. *Id.* On the second appeal, we determined that the district court improperly took into account the interplay between 18 U.S.C. § 924(c) and the Guidelines, as well as Working's low risk of recidivism, because both factors were already considered by the Guidelines. *Id.* at 807-808. We also concluded that the record did not provide any other reasons that would justify the one-day sentence. *Id.* at 808. This Court remanded and reassigned the case to a different judge for resentencing. *Id.* at 809. We held that after imposing the same sentence twice, the original judge "would have substantial difficulty disregarding the view that a one-day sentence was sufficient." *Id.* at 809-10. Our concern that the original judge would be "unlikely to disregard improper factors when fashioning a sentence" was "heightened" by certain statements made by the trial judge. *Id.* at 810. The trial judge stated that he "did not accept the fact that [Working's husband] was the victim." *Id.* The record further indicated that "the district court would be unlikely to set aside considerations of Working's sex, a clearly prohibited factor under the Guidelines, when resentencing." *Id.*

The facts of this case similarly support exercise of this Court's power to reassign Ressam's resentencing to a different district court judge. The trial judge originally sentenced Ressam to 22 years in prison. On appeal, we noted that the district court did not begin the sentencing proceeding by first determining the applicable Guidelines range, as required by *Carty*. *Ressam*, 538 F.3d at 1167. Accordingly, we vacated the sentence and remanded for resentencing in accordance with *Carty*. *Id.* Upon remand, the district court again imposed a 22-year sentence. At Ressam's resentencing the sentencing judge stated:

> As I said at Mr. Ressam's previous sentencing in 2005, determining an appropriate sentence in this case is a decision I struggled with more than any other sentencing decision I have made in my 27 years on the bench. In the time since Mr. Ressam's first sentencing, however, I have come to feel even more confident that the sentence I originally imposed was the correct one.

Sentencing Hr'g Tr. at 40-41, December 3, 2008.

The district court made the point of describing the original sentence as "correct" without apparent regard for developments since the original sentence was imposed. As described above, Ressam explicitly recanted his prior cooperation and affirmatively tried to aid those against whom he had testified previously. In his statement to the district court at the hearing at which the 22-year sentence was reimposed, Ressam disavowed the cooperation he had previously given, describing it as the product of mental incompetence and pressure put upon him, and claiming that he did not know what he was saying and that what he had said could not be relied upon. The prosecution reacted by contending that it never would have entered into cooperation with Ressam in the first place if it had known how it would turn out.

**[18]** It is unclear what reason there is to reward a defendant at all for cooperation at the same time that the defendant is disavowing having intended to cooperate and loudly proclaiming that his statements should not be believed. The district court gave no explanation of how, if at all, the subsequent developments were weighed in the new sentencing decision. The district court expressed concern that "[d]ownplaying the cooperation that Mr. Ressam provided the government would diminish the likelihood of future cooperation by other apprehended terrorists," but the court itself appeared to disregard the possible impact on other apprehended terrorists of reimposing the same sentence despite Ressam's subsequent disavowals. In short, the attachment of the district court to the sentence that was originally imposed was very powerful. The district judge "clearly did not put out of his mind his previously expressed view that [Ressam's cooperation] trumped all other [aggravating] factors combined, as shown by the fact that he again sentenced [Ressam] to a prison sentence [well below the bottom] of the Guidelines range." *Paul*, 561 F.3d at 975; *see also United States v. Vrdolyak*, 593 F.3d 676, 684 (7th Cir. 2010) (holding that "a judge's errors in calculating [a sentence] are indicative of an *idee fixe*" where the judge appears unwilling to waver in his conviction that a particular sentence is warranted).

**[19]** We must also consider "whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness." *Mikaelian*, 168 F.3d at 387-88. We are mindful that the district judge has spent nearly a decade with this complex case, that the record is substantial, and that the next judge will have to duplicate some of the prior effort. Even so, we have determined that the benefit of reassignment is worth the cost in duplication. The district judge's previously expressed views appear too entrenched to allow for the appearance of fairness on remand. For these reasons, we direct that the case be re-assigned to a different judge for resentencing. We intimate no view on what a proper sentence would be.

## Conclusion

We vacated the district court's original sentence of 22 years of imprisonment because it failed to permit this Court to conduct a meaningful review of the Government's challenge to the reasonableness of Ressam's sentence. *Ressam*, 538 F.3d at 1167. Prior to the sentencing hearing on July 27, 2005, Ressam argued that he had ceased cooperating with the Government because he was having trouble remembering details as the result of a combination of solitary confinement and repeated interrogation.

At the resentencing hearing, however, Ressam informed the district court that he "[retracted] almost all the statements he had made in the past" against two persons accused of terrorism in order to "cause their cases to be dismissed." Once again, the district court imposed the same 22-year sentence that this Court previously vacated because we could not decide whether it was reasonable based on the record of the original sentencing proceedings. In doing so, the district court failed to provide any reasons for rejecting the Government's arguments tethered to relevant § 3553(a) factors, including the value to be given to Ressam's early cooperation with the Government in view of his subsequent recantations and the need to protect the public from Ressam's potential to commit future terrorist crimes, as he will be only 53 years old upon his release. Without such explanations, we cannot conduct a meaningful review under the abuse of discretion standard to determine whether a sentence that is 43 years below the advisory Sentencing Guidelines is substantively reasonable, or whether a longer sentence is needed to protect the public from future terrorist crimes by Ressam.

Because the trial judge's previously expressed views appear too entrenched to allow for the appearance of fairness on remand, we direct that the case be re-assigned to a different judge for resentencing.

**SENTENCE VACATED, REMANDED FOR RE-ASSIGNMENT AND RESENTENCING.**

---

FERNANDEZ, Circuit Judge, dissenting:

We are required to give due deference to a district court's sentencing decisions. *See United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc). That does not mean a grudging deference; it means that even if we would prefer a different sentence, we may not reverse. *Id.* In fact, "[e]ven if we are certain that we would have imposed a different sentence had we worn the district judge's robe, we can't reverse on that basis." *United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008). As I see it, that requires us to approach our review of a substantive reasonableness[1] issue with a great deal of humility. It is not always easy to avoid consulting oneself about what one would do if one were the sentencing judge. A case like this is especially tempting in that regard, and I fear that the majority has not resisted the temptation into which it has been led.

The record here makes it apparent that the district court, which lived with this case for many years, considered the materials placed before it and touched all of the procedural bases.[2] The court calculated the guideline range,[3] and no one

---

[1]The government has expressly conceded that the sole issue on appeal is substantive reasonableness. That is all we should consider. In part II of the opinion, however, the majority, indicates that, despite the government's concession, it must and will take up procedural error, but shrouds that determination with a brume of words whereby it suggests that procedure must be melded into the substantive reasonableness determination. The result is a gallimaufry that, by mistake or design, will (as it does here) require courts to consider far more than substantive reasonableness, even when the parties raise only that. No doubt that hodgepodge has contributed to the majority's ultimate erroneous decision here. Unfortunately, it is also a disagreeable gift to the law, and it will keep on giving.

[2]Again, the government does not even contend on appeal that there was reversible procedural error.

[3]*See* 18 U.S.C. § 3553(a)(4).

says that it did so improperly. It also considered that range. It then expressly considered the nature and circumstances of Ressam's heinous offense and the history and characteristics of Ressam;[4] the seriousness of the offense, the need to promote respect for the law, and the need to impose a just punishment;[5] the need to adequately deter others;[6] and the need to avoid sentence disparities.[7] And, while it did not specifically discuss the need to protect the public,[8] it did note that it had to consider that, and we have nothing to indicate that it did not do so. The same is true of the provision regarding treatment of Ressam in the most effective manner,[9] although the court's reflection on the onerous conditions of Ressam's incarceration might be seen as touching on that issue. And, while the court did not specifically mention the kinds of sentences available,[10] that does seem rather obvious in this case. Of course, it is not even necessary for a district court to refer to each and every item in § 3553 when it sentences a miscreant. *See Carty*, 520 F.3d at 992. We do, after all, "assume that district judges know the law and understand their obligation to consider all of the § 3553(a) factors . . . ." *Id.*

So where does that leave the majority? Simply put, it seems to me that the majority just does not like the fact that this terrorist is to sit in prison for a mere twenty-two years. What number would the majority choose; who knows? But although many federal sentences are even more draconian, twenty-two years seems like a long time to me, whether a defendant is young or old to start with. It is not a mere slap on the wrist, especially if the confinement conditions will be especially

---

[4]*See id.* § 3553(a)(1).

[5]*Id.* § 3553(a)(2)(A).

[6]*Id.* § 3553(a)(2)(B).

[7]*Id.* § 3553(a)(6).

[8]*Id.* § 3553(a)(2)(C).

[9]*Id.* § 3553(a)(2)(D).

[10]*Id.* § 3553(a)(3).

harsh, as the district court predicted they would be. Yet, when all is said and done, the majority simply does not like the way the district court weighed the evidence before it; obviously the majority would have done it differently.

Would I give Ressam that "light" a sentence? I somehow doubt it, but that is not the point. The point is that there are many sites within the borders of reasonable sentencing territory, and our job is to patrol those borders to assure that the district court has not slipped over them and into the land of abusers of discretion. That will rarely happen; it did not happen here. Unfortunately, this case is not just about what befalls Ressam; it reflects another entry by appellate courts into territory that always lures them, but is always forbidden to them. Society, we, and the district courts will someday regret the results of our case-by-case trespassing onto lands we should stay out of; the day this decision becomes law will, indeed, be a *dies infaustus*.

In short, the sentence was neither procedurally erroneous nor substantively unreasonable. *See Carty*, 520 F.3d at 993. Even if we have to grit our teeth to do so, we should let it be.[11]

Thus, I respectfully dissent.

---

[11]Even if I were to agree with the majority on the sentencing issue itself, I could not agree with its decision to remove Judge Coughenour because I do not see his approach to Ressam's sentencing as either indurate or inexplicable. I would not order transfer of this complex, long-standing (over ten years) case to a different district judge.